15 A.3d 345

COMMONWEALTH of Pennsylvania, Appellee

v.

John C. LESKO, Appellant.

Commonwealth of Pennsylvania, Appellant

v.

John C. Lesko, Appellee.

Commonwealth of Pennsylvania, Appellee

v.

John C. Lesko, Appellant.

Nos. 518 CAP, 519 CAP, 520 CAP.

Supreme Court of Pennsylvania.

Submitted March 18, 2008.

Decided Feb. 24, 2011.

130

134

138

144

Samuel J.B. Angeli, Robert Brett Dunham, Defender Association of Philadelphia, Philadelphia for John C. Lesko.

Thomas R. Grace, John W. Peck II, Westmoreland County District Attorney's Office, Amy Zapp, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Chief Justice CASTILLE.*

In these consolidated capital post-conviction cross-appeals, the Commonwealth challenges the August 7, 2006 order of the Westmoreland County Court of Common Pleas awarding John C. Lesko a new trial and penalty hearing under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. In his protective cross-appeal, Lesko challenges the portions of the PCRA court's ruling which denied certain claims for relief. The appeals of the PCRA court's order are directly reviewable by this Court pursuant to 42 Pa.C.S. § 9546(d). For the reasons that follow, we reverse the order of the PCRA court granting Lesko a new trial and a new penalty hearing, and we dismiss the petition for PCRA relief.

The guilt phase of the trial established that Lesko participated in the murder of Apollo Police Officer Leonard Miller. *See Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983), *cert. denied,* 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984). Specifically, the facts demonstrate that in the early morning hours of January 3, 1980, Officer Miller was on duty when a silver-colored Lancia sports car containing three men—Lesko, Michael Travaglia, and Richard Rutherford— sped past his position at the Apollo Stop–and–Go convenience store several times. Officer Miller radioed for assistance, then pursued and stopped the sports car. When back-up officers arrived, they found Officer Miller lying on the high-

* This case was reassigned to this author.

way, dead from two bullets from a .38 caliber handgun. His service revolver was drawn and all six rounds were fired. Police subsequently located the sports car, which had been abandoned. The windows were shattered and the car had bullet holes in it. It was determined that the car was registered to a William Nicholls of Pittsburgh, who had recently disappeared.

Prior to Officer Miller's murder, the Pennsylvania State Police had received information indicating that Travaglia may have been involved in a number of armed robberies and killings in Pittsburgh and surrounding counties. While conducting their investigation, the State Police found a vehicle owned by a homicide victim. The vehicle had been abandoned near a motel where Travaglia and Daniel Keith Montgomery had stayed.

Pittsburgh police located Montgomery and discovered a .38 caliber handgun on his person. Montgomery told the police that Travaglia had given him the weapon and that Travaglia and Lesko talked about killing a police officer. Montgomery then told the police that Lesko and Travaglia were staying in a room at the Edison Hotel in Pittsburgh. The police proceeded to the Edison Hotel where they arrested Lesko and Travaglia. After being given Miranda[1] warnings, Lesko and Travaglia were individually interrogated. Both gave statements implicating themselves in the killing of Officer Miller, as well as in the killings of William Nicholls, Peter Levato, and Marlene Sue Newcomer.

Following various delays caused by two changes of venue and a mistrial, a joint trial of Lesko and Travaglia commenced in the Westmoreland County Court of Common Pleas on January 21, 1981, before Judge Gilfert Mihalich and a jury which had been selected in Berks County. The jury convicted both men of first-degree murder and conspiracy for the killing of Officer Miller. Subsequently, the jury returned a sentence of death for each defendant. On their joint direct appeal, this Court affirmed the convictions and sentences. *See Travaglia,*

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*supra.* Thereafter this Court affirmed the denial of Lesko's petition for relief under the Post Conviction Hearing Act ("PCHA"), 42 Pa.C.S.A. § 9541 *et seq.* (the predecessor to the PCRA). *See Commonwealth v. Lesko,* 509 Pa. 67, 501 A.2d 200 (1985), *cert. denied,* 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987).

Lesko filed a petition for a writ of *habeas corpus* in federal district court. Ultimately, on federal appeal in 1991, the U.S. Court of Appeals for the Third Circuit granted sentencing phase relief, concluding that the prosecutor made improper comments during the penalty phase of the trial that tainted the jury's sentencing decision. *See Lesko v. Lehman,* 925 F.2d 1527 (3d Cir.), *cert. denied,* 502 U.S. 898, 112 S.Ct. 273, 116 L.Ed.2d 226 (1991). Following a second sentencing proceeding before the Honorable Gary P. Caruso of the Westmoreland County Court of Common Pleas in 1995,[2] a jury found four aggravating factors and four mitigating factors.[3] The jury concluded that the aggravating factors outweighed the mitigating factors and returned a sentence of death pursuant to 42 Pa.C.S. § 9711(c)(1)(iv).

On direct appeal from his new death sentence, Lesko raised a number of issues related to his resentencing proceeding and second imposition of the death penalty. This Court again affirmed Lesko's sentence of death, *Commonwealth v. Lesko,* 553 Pa. 233, 719 A.2d 217 (1998), and, on January 19, 1999, the

---

**2.** The Third Circuit initially remanded the case to the federal district court, as will be discussed *infra,* to resolve an evidentiary issue relevant to resentencing, before the case proceeded to a second penalty hearing.

**3.** The four aggravating factors were: the victim was a police officer killed in the performance of his duties, 42 Pa.C.S. § 9711(d)(1); the defendant had a significant history of felony convictions involving use or threat of violence to the person, § 9711(d)(9); and the defendant had been convicted of another federal or state offense for which a sentence of life imprisonment or death was imposable, namely, the murders of Peter Levato and Marlene Sue Newcomer, § 9711(d)(10) (one aggravator for each murder). The four mitigating factors were: the defendant was under the influence of extreme mental or emotional disturbance, § 9711(e)(2); the defendant's service to others; the defendant's horrible childhood; and the defendant's change in character over the last fifteen years of his confinement, the last three mitigators falling under the catchall provision of Section 9711(e)(8).

U.S. Supreme Court denied Lesko's petition for a writ of *certiorari*, 525 U.S. 1108, 119 S.Ct. 878, 142 L.Ed.2d 778 (1999). On January 25, 1999, then-Governor Thomas R. Ridge signed a warrant scheduling Lesko's execution for March 18, 1999. On February 10, 1999, Lesko filed a *pro se* petition for relief under the PCRA, attempting to challenge both his conviction and sentence, and moving for a stay of execution. On February 24, 1999, the PCRA court entered an order granting a stay of execution and appointing Robert Brett Dunham, Esquire, to represent Lesko in filing an amended PCRA petition. Lesko had previously been represented at all times by Rabe F. Marsh, III, Esquire, who was appointed to represent Lesko shortly after his arrest in 1980. At various times during his representation of Lesko, Attorney Marsh was assisted by other attorneys. Attorney Marsh was granted permission to withdraw as counsel upon Attorney Dunham's entry of appearance. On May 24, 1999, Attorney Dunham filed an amended PCRA petition and a petition for *habeas corpus* relief on behalf of Lesko, which were followed by subsequent addendums and supplements. The PCRA proceedings were assigned to the Honorable Richard E. McCormick, Jr., of the Westmoreland County Court of Common Pleas.

On December 14, 15, and 16, 1999, the PCRA court held evidentiary hearings at which Lesko presented the testimony of Attorney Marsh, Attorney Marsh's co-counsel, Brian O'Leary, and Dr. Herbert E. Levit, a psychologist who had evaluated Lesko for the second penalty hearing. Additional evidentiary hearings were held on March 21 and 22, 2001, and on April 25 and 26, 2002. Following these evidentiary hearings, and at the direction of the PCRA court, the parties filed a number of post-hearing pleadings. On August 7, 2006, by opinion and order, the PCRA court held that Lesko, for a variety of reasons discussed in detail below, was entitled to a new trial and a third penalty hearing.

The Commonwealth appealed the PCRA court's order granting relief with regard to both the guilt and the penalty

phase and Lesko filed a protective cross-appeal raising issues on which he did not obtain relief.

Our standard of review in an appeal from the grant or denial of PCRA relief requires us to determine whether the ruling of the PCRA court is supported by the record and is free from legal error. *See Commonwealth v. Washington*, 592 Pa. 698, 927 A.2d 586, 593 (2007).

## I. JURISDICTION OVER GUILT STAGE CLAIMS

Before turning to the specific claims on which the PCRA court ruled, the Commonwealth raises a controlling preliminary question regarding whether the PCRA court erred in entertaining **any** of Lesko's claims related to his 1981 conviction (the "guilt phase claims") because those claims are time-barred.

In his PCRA petition, Lesko asserted a number of claims of ineffective assistance of trial counsel related to the guilt phase of his 1981 trial. The PCRA court awarded Lesko a new guilt phase on its finding that trial counsel interfered with Lesko's right to testify at trial. The PCRA court also found that Lesko was entitled to a new trial based on his *Brady*[4] claims and derivative trial counsel ineffectiveness claims related thereto, which will be discussed separately. Specifically, the PCRA court determined that the Commonwealth's failure to produce relevant impeachment evidence cumulatively prejudiced Lesko, and that Lesko's counsel was ineffective for failing to obtain certain impeachment evidence and impeach certain witnesses. The Commonwealth contends that the PCRA court erred in addressing these claims because they were untimely.[5]

According to the Commonwealth, under the time requirements of the PCRA, Lesko had to raise any claims relating to his original trial by January 16, 1997, the date on or before which a first PCRA petition would be deemed timely in a case,

---

**4.** *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

**5.** The Commonwealth does not dispute that Lesko's ineffective assistance of counsel claims regarding his second penalty trial are timely.

like the one *sub judice*, where the judgment of sentence became final before the effective date of the 1995 amendments to the PCRA. As Lesko first raised the claims in February 1999, the Commonwealth argues that the claims are time-barred and the PCRA court did not have jurisdiction to entertain them. The Commonwealth further asserts that Lesko failed to plead or prove any of the exceptions to the PCRA's time requirements, and that Lesko's efforts to couch his claims in terms of ineffectiveness of counsel cannot save his otherwise untimely petition.

Lesko, in contrast, maintains that his 1999 PCRA petition was, in fact, timely, and, therefore, that the PCRA court had jurisdiction to consider the guilt phase ineffectiveness claims raised therein. He points out that his second death penalty sentence, imposed in 1995, did not become final until January 19, 1999, after the Supreme Court of the United States denied his petition for *certiorari*. Thus, Lesko argues that his PCRA petition, filed February 10, 1999, was filed within one year of the date his judgment of sentence became final.

Lesko further suggests that the only issue implicating the PCRA court's ability to review his claims of guilt phase ineffective assistance of counsel is whether his claims were waived because they were not raised in a prior PCRA petition. On the issue of waiver, Lesko contends, and the PCRA court agreed, that because Lesko was represented by trial counsel at all times prior to filing his 1999 PCRA petition, the 1999 petition represented his first opportunity to present claims of ineffective assistance of trial counsel, and, therefore, the ineffectiveness claims were not waived. *See Commonwealth v. Bennett*, 593 Pa. 382, 930 A.2d 1264, 1274 (2007) (recognizing general rule that counsel cannot raise his own ineffectiveness); *Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 775 n. 7 (2004) (where appellant was represented by same counsel at trial and on direct appeal, PCRA proceeding is deemed first opportunity to challenge stewardship of prior counsel).

The PCRA court reasoned that it had jurisdiction over the guilt phase ineffectiveness claims because the PCRA proceedings were the first time that an independent attorney had

reviewed Lesko's case and, thus, presented the first opportunity Lesko had to challenge trial counsel's conduct during the guilt phase. The PCRA court also pointed out the well-established tenets that counsel generally is not permitted to raise his own ineffectiveness; PCRA review is the appropriate avenue to raise ineffectiveness claims for a defendant who was represented by the same counsel at trial and on direct appeal; and issues of ineffectiveness must be raised at the earliest stage of the proceedings at which the counsel whose effectiveness is being challenged no longer represents the defendant.[6] Accordingly, the court concluded that it had jurisdiction over the guilt phase claims.

Having considered the competing arguments as well as the PCRA court's reasoning, we agree with the Commonwealth that Lesko is not entitled to PCRA review of his guilt phase claims to the extent he seeks to challenge anything but the Commonwealth's failure to disclose allegedly material evidence, because his petition is time-barred as to those claims; and because he has not argued or demonstrated any exceptions to the jurisdictional time requirements as set forth in 42 Pa.C.S. § 9545(b)(1). We conclude that this result is commanded by the terms and purpose of the PCRA, by the terms and purpose of the federal *habeas* order which led to Lesko's resentencing proceeding, and by an appreciation of the very limited role played by the lower federal *habeas* courts in "reviewing" final state criminal judgments.

The novel question presented here may be phrased as: when a federal *habeas corpus* court sitting in civil collateral review of a final Pennsylvania judgment directs coercive, limited relief in the form of ordering Pennsylvania authorities to offer a convicted capital defendant a new penalty hearing, but does not purport to affect the underlying conviction or final judgment in any other manner, does the federal order

---

**6.** The PCRA court's iteration of the tenet relating to the timing of the presentation of ineffectiveness claims was consistent with *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977). The *Hubbard* rule was subsequently overruled in *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). The instant petition was filed prior to the overruling of *Hubbard*.

operate to reopen the untouched Pennsylvania judgment concerning the verdict of guilt to serial collateral attack in state court. Lesko believes he is entitled to a fourth round of review of his guilt phase as of right under the PCRA, as a consequence of the federal *habeas* order. Lesko's theory, which the PCRA court appears to have adopted, depends on his assertion that the 1981 judgment of sentence did not become final until the conclusion of this Court's direct review of his second penalty hearing, which followed the federal collateral proceedings. Such a theory rests, in part, upon a view that collateral federal proceedings are but another step in the appellate review process; but that view fails to consider the actual and much more limited nature of such proceedings and their effect on state court final judgments.

■■■ The terms of the PCRA do not specifically address the scenario presented here. By enacting the PCRA, the Legislature has prescribed the route that all collateral review of criminal convictions and sentences in Pennsylvania must follow. 42 Pa.C.S. § 9542 ("The action established in this subchapter shall be the sole means of obtaining collateral relief and encompasses all other common law and statutory remedies ..., including habeas corpus and coram nobis."). The PCRA is not a part of the direct criminal proceeding. *See* *Pennsylvania v. Finley*, 481 U.S. 551, 556–57, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). The PCRA has a commensurately limited purpose as it provides only "for an action by which persons convicted of crimes they did not commit and persons serving illegal sentences may obtain collateral relief." 42 Pa.C.S. § 9542. The types of claims deemed cognizable under the PCRA likewise are not limitless. Instead, the PCRA petitioner must plead and prove "[t]hat the conviction *or* sentence resulted from one or more of the following [enumerated errors] ...," including, *inter alia*, a violation of the United States or Pennsylvania Constitutions or ineffective assistance of counsel. 42 Pa.C.S. § 9543(a)(2). Furthermore, a petitioner does not have an absolute right to collateral review and is not afforded review of claims previously litigated or waived. 42 Pa.C.S. § 9543(a)(3) & (a)(4); 42 Pa.C.S.

§ 9544(a) & (b); *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 726 (2000).

In addition to detailing the types of claims that are cognizable under the PCRA, the PCRA further limits collateral review by utilizing jurisdictional time limitations. These limits provide that a PCRA petition must be filed within one year of the date the judgment became final. 42 Pa.C.S. § 9545(b)(1). Furthermore, any petition filed outside of the one-year jurisdictional time bar is unreviewable unless it meets certain listed exceptions and is filed within sixty days of the date the claim first could have been presented. 42 Pa.C.S. § 9545(b)(1)(i)-(iii) & (b)(2). The 1995 amendments to the Act, which adopted the time-bar, also provide that if the judgment of sentence became final before the January 16, 1996 effective date of the amendments, a PCRA petition will be considered timely if it is filed within one year of that date, or by January 16, 1997. But this grace period only applies to first post-conviction petitions filed as of right, not serial petitions. As this Court explained in *Commonwealth v. Fahy*, "where the judgment becomes final on or before the [PCRA's 1995] amendments' effective date, a petition will be deemed timely if the petitioner's *first* petition is filed within one year of the effective date of the amendments." 558 Pa. 313, 737 A.2d 214, 218 (1999) (emphasis original).

The Legislature, however, did not speak to whether there is a right to supplemental state collateral review following a federal *habeas* mandate, which results in a new penalty hearing. It could be argued that the PCRA's silence on this issue indicates that a defendant who receives a new sentencing proceeding as a result of a federal *habeas* order cannot invoke the PCRA even as to his new sentence. Therefore, the foundational question, properly framed, is whether the PCRA allows **any** new and additional collateral attack following a resentencing occasioned by a grant of federal *habeas* relief.

The parties and the PCRA court assumed the answer to this statutory question was "yes" with limited reasoning. We agree, but not because the PCRA by its terms plainly requires

such review. Instead, we find the answer in the fact that this Court has construed the PCRA broadly to encompass those types of claims that would have been available for review under common law *habeas corpus* principles, in order to effectuate the PCRA's explicit role as the repository for claims which would otherwise have been available under state *habeas corpus*. *See Commonwealth v. Bennett,* 930 A.2d at 1276–77 (Saylor, J., dissenting) (outlining history). The new sentencing proceeding and its result are the cause of the defendant's continuing restraint; and that proceeding is sufficiently distinct from the initial sentencing proceeding that collateral review of issues specific to the resentencing is consistent with the plain intent and purpose of the PCRA. But, the calculus is entirely different when the defendant seeks to invoke the new sentencing judgment as a basis to pursue, as of right, issues that do not arise from the resentencing proceeding. And, as explained below, the nature of federal *habeas* review, and the limited role played by the lower federal courts in "reviewing" final state criminal judgments, corroborates that a limited grant of federal *habeas* sentencing relief does not give rise to a "right" to full-blown serial PCRA review of a trial whose result (conviction) has long been final.

■ In order to understand the role of the federal courts and the purpose of federal collateral review of state convictions, some background is in order. The U.S. Constitution does not mandate any federal *habeas corpus* review of a prisoner's confinement following a final state judgment of conviction: the availability and scope of the writ in that circumstance is Congress's prerogative, *see, e.g., Felker v. Turpin,* 518 U.S. 651, 662–63, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996), though the Court might step in if Congress failed to resolve the question. *Lonchar v. Thomas,* 517 U.S. 314, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996). The first Congress did not make the writ available to state prisoners; it was not until 1867 that Congress created a general power for collateral review; "[a]nd it was not until well into [the 20th] century that [the U.S. Supreme] Court interpreted [the legislation] to allow a final judgment of conviction in a state court to be collaterally

attacked on *habeas.*" *Felker, supra.* The U.S. Supreme Court's expansion of the civil writ to permit inquiry into federal issues other than the jurisdiction of the state court is an even later development. *See Wright v. West,* 505 U.S. 277, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (plurality opinion by Thomas, J., and concurring opinion by O'Connor, J., debate precise beginnings of expanded use of writ).[7] The Court's expansion of the writ authorized the lower federal courts to reexamine the merits of a state prisoner's federal claims, even if those claims had been fully and fairly litigated in state court, and without any deference to the state court's determination. *See Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953). As a result, lower federal court judges were permitted to upset state court criminal judgments anytime they disagreed with the state court's resolution of a federal claim, effectively giving the lower federal courts control over the state courts' findings, including those of the highest court of a state, notwithstanding that state courts are coequal to the lower federal courts on questions of federal law.[8]

■ A growing sensitivity to concerns of federalism and comity eventually led to a corrective adjustment of this federal *habeas* review scheme, and it was the U.S. Supreme Court itself that initiated those corrective measures, beginning in the 1970s. "These retractions were policy-based limitations on the availability of the *habeas* remedy. That is, the Supreme Court established by case law various rules under which the *habeas* court would refrain from granting relief, even though it

7. For a full treatment on the historical availability of federal *habeas* review for convicted state prisoners, *see* Kent S. Scheidegger, *Habeas Corpus, Relitigation, and the Legislative Power,* 98 Colum.L.Rev. 888, 928–933 (May 1998).

8. A necessary consequence of this non-deferential review scheme was that lower federal courts often injected errors into otherwise valid state court proceedings. *See, e.g., Wright v. West, supra* (reversing circuit court that had erroneously granted *habeas* relief to state prisoner on sufficiency of evidence claim); *Dunn v. Simmons,* 877 F.2d 1275 (6th Cir.1989) (concluding that Kentucky's procedure for litigating validity of prior convictions violated federal standards, but Kentucky rule was later found to "easily pass[ ] constitutional muster" by U.S. Supreme Court in *Parke v. Raley,* 506 U.S. 20, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992)).

had the jurisdiction to do so." Scheidegger, *supra,* at 933 (discussing retractions); *see Calderon v. Thompson,* 523 U.S. 538, 554–55, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) (given "the profound societal costs that attend the exercise of *habeas* jurisdiction" over state convictions, "we have found it necessary to impose significant limits on the discretion of federal courts to grant *habeas* relief") (citations omitted) (listing examples of retractions). One of the key retractions was the nonretroactivity principle that derived from *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion). The *Teague* restriction, which has since been repeatedly embraced by the U.S. Supreme Court as a majority rule, *e.g., Butler v. McKellar,* 494 U.S. 407, 415, 110 S.Ct. 1212, 108 L.Ed.2d 347 (1990), generally "prevents a federal court from granting *habeas corpus* relief to a state prisoner based on a rule announced after his conviction and sentence became final." *Caspari v. Bohlen,* 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994). By preventing federal *habeas* courts from upsetting state court judgments that were correct under the federal constitutional rules in existence at the time of trial, the *Teague* rule restored a measure of respect for the sovereign state courts, and placed some limits on the lower federal court's power to overturn reasonable state court determinations of federal questions. "The 'new rule' principle ... validates reasonable, good-faith interpretations of existing precedents made by state courts, ... and thus effectuates the States' interests in the finality of criminal convictions and fosters comity between federal and state courts." *Gilmore v. Taylor,* 508 U.S. 333, 340, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993). By the same token, the *Teague* rule recognized that *habeas* relief should be available only where the legitimate purpose of *habeas* review would be served, *i.e.,* as an "additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards." *Saffle v. Parks,* 494 U.S. 484, 488, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), quoting *Teague,* 489 U.S. at 306, 109 S.Ct. 1060, quoting *Desist v. United States,* 394 U.S. 244, 262–63, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting).

■■ In the wake of *Teague* and its progeny, the U.S. Congress went even farther in restoring respect for the sovereignty of the states in the realm of federal *habeas* review of state convictions. Thus, in 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which included a new and deferential federal *habeas* standard of review. Under 28 U.S.C. § 2254(d), federal *habeas* relief may be granted to a state prisoner only if the state court's review of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts...." Under AEDPA, the federal court is no longer free to grant a state prisoner *habeas* relief simply because the court disagrees with a state court determination of a federal question. Moreover, a state court judgment can be said to be unreasonable under federal constitutional law only when it is measured against settled precedent from the highest court in the land.

In contrast to the substantive standards governing federal *habeas* review of state convictions, the nature of the *habeas* remedy has remained comparatively constant. In *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963) [9], the U.S. Supreme Court, per Justice Brennan, addressed the *habeas* remedy, noting that when a federal court determines that the right of personal liberty has been denied by the state and a person confined as a result, "the federal court has the power to release him ... it has no other power; **it cannot revise the state court judgment;** it can act only on the body of the petitioner." *Id.* at 430–31, 83 S.Ct. 822 (emphasis added). Indeed, federal *habeas corpus* proceedings are civil in nature because they exist "for the enforcement of a right to personal liberty, rather than as a stage of the state criminal proceedings or as an appeal therefrom...." *Id.* at 423–24, 83

9. A different part of *Fay* was overruled on other grounds in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (procedural default constitutes independent and adequate state ground preventing federal *habeas* review).

S.Ct. 822.[10] Thus, a proper grant of federal *habeas* relief to a state prisoner does not purport to revise or interfere with the state court's criminal judgment. *Fay, supra; Henderson v. Frank*, 155 F.3d 159, 168 (3d Cir.1998). Indeed, any attempt to so interfere is patent error. *See, e.g., Dickerson v. Vaughn*, 90 F.3d 87, 92 (3d Cir.1996) (district court should not directly order state court to grant defendant an appeal); *Smith v. Lucas*, 9 F.3d 359, 367 (5th Cir.1993) (district court's directive to Mississippi state courts to impose sentence of life imprisonment did not comply with federal law); *Duhamel v. Collins*, 955 F.2d 962, 968 (5th Cir.1992) (federal court does not have authority to commute death sentence to sentence of life imprisonment); *Magwood v. Smith*, 791 F.2d 1438, 1450 (11th Cir.1986) (federal district court and court of appeals have no appellate authority over state court and, hence, have no authority to "remand" case to state court).

Instead, federal *habeas* directives to state authorities are designed to be coercive. Thus, the federal courts issue a "conditional" grant of the writ, which delays implementing the writ, *i.e.*, the release of the prisoner, to allow the state the opportunity to correct the perceived constitutional violation. *Henderson*, 155 F.3d at 168 ("It would seem that federal *habeas* power is limited, first, to a determination of whether there has been an improper detention by virtue of the state court judgment; and second, if [the federal court] find[s] such an illegal detention, to ordering the immediate release of the prisoner, conditioned on the state's opportunity to correct constitutional errors that [it] conclude[s] occurred in the initial proceeding."); *see also Smith*, 9 F.3d at 367; *Duhamel*, 955 F.2d at 968. Such indirect orders not only pay heed to the historical use of the writ and the interests of the *habeas*

---

**10.** The *Fay* Court further explained:

> [T]he writ of *habeas corpus* is a new suit brought by the petitioner to enforce a civil right, which he claims as against those who are holding him in custody. The proceeding is one instituted by himself for his liberty, and not by the government to punish for his crime. The judicial proceeding under it is not *to inquire* into the criminal act which is complained of, but *into the right to liberty* notwithstanding the act. It is not a proceeding in the original action.

*Fay*, 372 U.S. at 424 n. 34, 83 S.Ct. 822.

plaintiff, but also recognize the significant state interests at stake. As the U.S. Supreme Court explained in *Jackson v. Denno*, 378 U.S. 368, 393, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), "a state defendant should have the opportunity to have all issues" tried in a state court "under appropriate state procedures." But the "State, too, has a weighty interest in having valid federal constitutional criteria applied in the administration of its criminal law by its own courts and juries." *Id.* The federal remedy should be narrowly designed to enable the state court to fulfill its constitutional obligation. *Dickerson*, 90 F.3d at 92; *see also Henderson*, 155 F.3d at 168 (noting "federal courts have most often granted the relief in *habeas* cases that has required the least intervention into the state criminal process."). Furthermore, once the state court or other authority timely acts to address the perceived violation forming the basis for the issuance of the conditional writ, the final writ will not issue.

Having set forth our understanding of the terms and nature of the PCRA, the nature of federal *habeas* review of state court convictions, and the limited role played by the lower federal courts in reviewing final state court judgments, the answer to whether the federal civil collateral order entered in this case operates to reopen the final Pennsylvania judgment concerning the verdict of guilt is clear. It does not.

Lesko's federal *habeas* petition raised claims attacking both his conviction and his penalty. His guilt phase claims were specifically rejected; the relief he received was confined to the penalty proceeding. Thus, the Third Circuit's order authorizing conditional issuance of a writ of *habeas corpus* provided:

> For the reasons stated in this opinion, we will reverse the judgment under review [*i.e.*, the judgment of the federal district court] to the extent that it sustains the imposition of the death penalty. We will remand to the district court for the holding of an evidentiary hearing on [Lesko]'s claim that his Indiana County guilty plea was not voluntary and for the subsequent issuance of the writ insofar as the death penalty is concerned.

We will direct the district court to issue the writ subject to the holding of a state court resentencing proceeding within a reasonable period of time to be set by the district court. If the district court determines, on the basis of the evidentiary hearing described in the last paragraph, that [Lesko]'s Indiana County guilty plea was not voluntary, the writ shall be issued subject to the additional requirement that evidence of the guilty plea not be introduced at the resentencing proceeding.

We will affirm the judgment under review to the extent that it sustains the determination of [Lesko]'s guilt.

*Lesko v. Lehman,* 925 F.2d at 1555.[11]

On remand from the Third Circuit, the federal district court deemed the guilty plea related to the Indiana County murder to be involuntary "by the representation that it would not be introduced during the Westmoreland penalty phase hearing." The district court's order conditionally granting *habeas* relief respecting the penalty phase specified that evidence related to the "void plea cannot be introduced at the resentencing proceeding in the Westmoreland County case." *Lesko v. Lehman,* 1992 WL 717815 (W.D.Pa.1992). The Westmoreland County Court of Common Pleas then conducted a second penalty hearing—not a trial on guilt or innocence—after which a jury of Lesko's peers again sentenced him to death. Lesko was denied relief from the resentencing proceeding on direct review to this Court and this state collateral appeal is now before us under, and subject to the terms of, the PCRA.

In light of the nature of PCRA review, the limited effect of collateral federal proceedings on a final state criminal judgment, and the nature of federal *habeas* relief, we conclude that Lesko's "right" to first petition PCRA review is necessarily confined to that part of the final Pennsylvania judgment that was disturbed by the federal *habeas* proceedings. All other aspects of the original judgment remain as before—**final.** The federal *habeas* court, far from purporting to upset the

11. In using the terms "reverse" and "affirm," the Third Circuit was not referring to the Pennsylvania judgment of sentence, but to the order of the federal district court.

verdict of guilt, explicitly "affirmed" the district court judgment "sustaining" that aspect of the trial. The resentencing that occurred as a result of the coercive federal *habeas* mandate did not purport to revive the claims that expired once the 1981 verdict of guilt became final. The finality of the judgment must be analyzed in light of the context in which the subsequent proceedings occurred, including the intervening *habeas* proceedings. Thus, we hold that the 1981 Pennsylvania judgment of sentence is final for all purposes **except** for that part of the final judgment that was disturbed by the federal *habeas* proceedings, *i.e.*, Lesko's penalty phase proceeding.

Lesko's judgment of sentence in terms of his conviction for first-degree murder became final in 1984, after his *certiorari* petition in the U.S. Supreme Court was denied. Lesko subsequently filed a timely PCHA petition, but was denied relief in 1985. Thus, Lesko did not qualify for the one-year tolling provision in the 1995 amendments as the instant filing represented a serial petition. *See Fay, supra.* (The Commonwealth's suggestion that Lesko had until January 16, 1997 to file a timely PCRA petition raising claims of ineffectiveness of trial counsel at his 1981 guilt trial is incorrect.) Rather, Lesko had until January 16, 1996—the date the 1995 amendments to the PCRA took effect, eliminating the ability to file serial PCRA petitions as of right—to file a timely second or subsequent PCRA petition raising claims arising from his 1981 guilt trial.[12] To allow Lesko to pursue a PCRA

---

12. Lesko argues that, because his direct appeal of his second death penalty sentence was pending with this Court when the PCRA was amended in 1995, he was unable to file a PCRA petition challenging trial counsel's effectiveness until that appeal concluded. In support of his argument, Lesko cites this Court's decision in *Commonwealth v. Lark*, 560 Pa. 487, 493, 746 A.2d 585, 588 (2000), wherein we held that, "when an appellant's PCRA appeal is pending before a court, a subsequent PCRA petition cannot be filed until the resolution of review of the pending PCRA petition by the highest state court in which review is sought, or upon the expiration of the time for seeking such review." *Lark* is distinguishable because, in that case, the appellant had a pending PCRA petition, not a direct appeal from a resentencing proceeding, which was deemed to require a delay in filing a serial PCRA. In addition, *Lark* obviously did not constrain appellant's options and

petition as of right to raise new guilt phase claims more than 25 years later, after a direct appeal, an of-right PCHA petition, and completed federal *habeas corpus* proceedings, would render the time limitations of the PCRA meaningless.

 Lesko emphasizes that because he was represented by the same counsel until the filing of his amended PCRA petition in 1999, the 1999 petition represented his first opportunity to challenge counsel's ineffectiveness at his original trial in 1981. But, it is well established that the fact that a petitioner's claims are couched in terms of ineffectiveness will not save an otherwise untimely petition from the application of the time restrictions of the PCRA. *Commonwealth v. Breakiron*, 566 Pa. 323, 781 A.2d 94, 97 (2001).

Lesko further maintains that this Court's decision in *Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d 872 (2002), "unequivocally establishes the correctness of the PCRA court's ruling that the guilt-stage issues from the initial trial in 1981 are substantively appropriate for PCRA review." Brief of Appellee Lesko at 9. In *Chambers*, the appellant was convicted and sentenced to death in 1987. On direct appeal, this Court affirmed his conviction, but remanded for a new penalty trial. After Chambers was sentenced to death a second time in 1994, he filed a direct appeal and that judgment of sentence was affirmed. Chambers was represented by the same counsel from the time of trial through his appeal of his second penalty trial. Subsequently, represented by new counsel, Chambers filed a timely PCRA petition challenging his 1994 judgment of sentence. This Court addressed Chambers' layered claims of ineffectiveness of trial counsel related to his conviction, despite the fact that the claims were raised in a PCRA petition that was filed more than one year after Chambers' original conviction became final.

decisions in 1995, five years before *Lark* was decided. And finally, nothing in *Lark* purports to create an extra-PCRA right to pursue a second post-conviction attack as of right, outside the realm of the PCRA's serial petition and time-bar restrictions. Appellant's guilt phase claims are available only to the extent he can satisfy the terms of the PCRA.

*Chambers,* however, is distinguishable from the instant case for several reasons. First, the Commonwealth in *Chambers* did not challenge the propriety of Chambers raising guilt phase claims and this Court did not raise such an inquiry *sua sponte;* in this case, the Commonwealth does recognize and pursue the jurisdictional issue. Second, the collateral proceedings following the new penalty phase in *Chambers* were state-court proceedings. Finally, Chambers' PCRA petition was his **first** petition for collateral relief and not a serial petition following federal *habeas* review. Accordingly, we hold that the PCRA court did not have jurisdiction over Lesko's claims related to guilt-phase errors and we reverse that portion of the PCRA court's order.[13]

## II. BRADY CLAIMS

As discussed previously, the PCRA court granted both guilt and penalty phase relief as a result of Lesko's *Brady* claims. Respecting the guilt phase, we note that a colorable *Brady* claim raised on serial collateral attack may qualify for review as an exception to the PCRA time-bar, depending upon the timing of the discovery of the alleged failure of the Commonwealth to disclose evidence, and whether the defendant diligently pursues the claim. *See* 42 Pa.C.S. § 9545(b)(1)(i) and (ii); *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848, 852 (2005). Given this fact, and the fact

---

**13.** The bulk of Lesko's non-*Brady* guilt phase claims sound in counsel ineffectiveness and are time-barred for the reasons discussed in the text above. Lesko also raises two questions arising from his prior conviction for the murder of William Nicholls, which he poses as direct appeal counsel's ineffectiveness for failing to raise them on direct appeal, following resentencing. First, he contends that the prosecution for the murder of Officer Miller should have been barred by 18 Pa.C.S. § 110 because of his guilty plea to the murder of Nicholls. According to Lesko, the two events were part of a single criminal episode. *See Commonwealth v. McPhail,* 547 Pa. 519, 692 A.2d 139 (1997) (plurality). Alternatively, Lesko argues that, if the two murders were not part of a single criminal episode, then evidence of the Nicholls murder should not have been admitted at trial or resentencing.

Although posed as resentencing errors, it is clear that these are guilt phase claims, and thus they too are time-barred. To the extent Lesko challenges the admission of evidence surrounding the Nicholls murder for purposes of resentencing, that claim is fully discussed *infra.*

that the same alleged *Brady* violations formed the basis for the PCRA court's grant of relief respecting both the guilt phase and the penalty phase, we will address the claims together, assessing the guilt phase under the PCRA's serial petition restrictions, and the penalty phase under the PCRA provisions governing first petitions.

In his PCRA petition, Lesko raised three claims alleging that the Commonwealth violated *Brady* by failing to disclose material evidence. Specifically, Lesko contended that he should have been given a statement made by Daniel Keith Montgomery to Pennsylvania State Trooper Michael K. Steffee (the "Steffee report"); that he should have been provided with a copy of the written agreement between the Commonwealth and Montgomery whereby the Commonwealth agreed not to prosecute Montgomery for certain property crimes he allegedly committed with Travaglia; and that the Commonwealth failed to disclose the juvenile records of Commonwealth witness Richard Rutherford,[14] revealing that Rutherford was given special treatment, including two four-hour furloughs from prison, prior to his testimony at trial. In addition to testifying at the 1981 trial, Rutherford and Montgomery testified at Lesko's 1995 resentencing hearing.

The PCRA court agreed with Lesko, concluding that these three separate pieces of information should have been disclosed to the defense. The PCRA court explained that the

**14.** This Court previously summarized Rutherford's trial testimony as follows:

> Rutherford's testimony consisted of an account of how he had accompanied Lesko and Travaglia from the Edison Hotel in downtown Pittsburgh, where the Appellants had abducted one William Nicholls in his automobile; how Travaglia had shot Nicholls in the arm and then forced him to drive them out of town; how both Appellants had abused Nicholls along the way; how they had driven to a lake and, after Rutherford helped them find a large rock, how Appellants had taken Nicholls down to the lake and returned to the car without him. Rutherford testified that the trio then went to Travaglia's father's house where they stole a .38 caliber pistol, and returned to the house and forced Rutherford to enter the garage to get other ammunition after they found the gun contained the wrong type. Rutherford then testified to their speeding past Officer Miller several times, and to the subsequent shooting of Miller by Travaglia.

*Travaglia*, 467 A.2d at 296–97.

Steffee report would have impeached Montgomery's testimony at the first trial and at the resentencing when he testified that Travaglia said, "Goddamn, or Jesus Christ, I shot a cop," and Lesko replied, "I wanted to," and then laughed. In an earlier statement to Trooper Steffee, however, Montgomery had stated, "I don't know anything about the cop getting shot," and said nothing about any remarks made by Lesko.

The PCRA court concluded that Lesko was unaware of this police statement until present PCRA counsel subpoenaed Pennsylvania State Police records from Harrisburg for the purpose of preparing for the PCRA proceeding. The court based this conclusion on the fact that at the PCRA hearing, both trial counsel and counsel for Travaglia testified that they had never seen the police report. Both counsel opined that the prior statement contained within the Steffee report provided important impeachment evidence, calling into question Montgomery's implication that Lesko evidenced his intent to kill the officer when he said, "I wanted to." Additionally, the PCRA court noted that the Commonwealth did not deny that it did not provide the report to the defense. The PCRA court also noted that the Commonwealth's *Brady* obligation extended to exculpatory evidence contained in the files of the police agencies of the same government bringing the prosecution, citing to *Kyles v. Whitley,* 514 U.S. 419, 438, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) and *Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136, 1141 (2001) (applying holding in *Kyles* ). For these reasons, the PCRA court concluded that "[t]he Steffee report is a document that should have been provided to the defense, but for some unexplained reason, was not." PCRA Court Opinion, 8/7/06, at 43–44 (record citations omitted).

The second piece of *Brady* evidence was the Montgomery agreement, which consisted of the Commonwealth's written agreement not to prosecute Montgomery for robberies that he had committed with Travaglia. The PCRA court explained that although, prior to trial, counsel had requested all evidence "favorable to the accused which is material either to guilt or to punishment in the possession or direct control of the attorney

of the Commonwealth," the written agreement was never provided to counsel and counsel never questioned Montgomery during cross-examination regarding whether the Commonwealth had agreed not to prosecute him in exchange for his testimony.

Similarly, related to the final piece of evidence, the PCRA court observed that Rutherford's juvenile record contained entries that indicated that he had received favorable treatment in anticipation of his testimony at trial. Again, the PCRA court suggested that this information was not provided to the defense.

Alternatively, the PCRA court implied that trial counsel may have known of these latter two pieces of evidence, but failed to demand them. Considering the reasonableness of counsel's conduct, the court concluded that the evidence would have provided useful impeachment evidence and that counsel offered no strategic reasons for failing to request such information. Specifically, the PCRA court observed that trial counsel "made no attempt to impeach the credibility of Montgomery on cross-examination and made a fleeting reference to an 'agreement' in his cross-examination of Rutherford, without any specific reference to the contents, substance or consequences of the agreement." *Id.* at 45–46. The PCRA court indicated that these two sources of impeachment would have called into question the testimony of Rutherford and Montgomery, who provided the basis for the jury to find that Lesko "intended" to kill Officer Miller. Additionally the PCRA court concluded that their testimony was not "inconsequential as it went directly to the most essential, and the only contested, element of the crime of murder of the first degree—intent." *Id.* at 44–45. The court went on to suggest that it was the cumulative prejudice from the Commonwealth's failure to reveal multiple pieces of exculpatory evidence, combined with counsel's failure to interview witnesses and gather relevant impeachment evidence, which undermined the fairness of the proceedings. For these reasons, the court concluded that Lesko was entitled to a "new guilt-stage trial and a new sentencing hearing."

The Commonwealth argues that the PCRA court erred in concluding that Lesko is entitled to a new guilt trial under *Brady*. According to the Commonwealth, the PCRA court erred in holding that the Commonwealth's failure to provide Lesko with the Steffee report prejudiced him, because it "fail[ed] to account for other substantive evidence of motive and participation on the part of Lesko in the murder of Officer Miller," and, therefore, even if Lesko's statement "I wanted to" had been omitted from the trial, the jury's verdict would not have been different. Brief of Appellant Commonwealth at 27. The Commonwealth points out that there was other very damning evidence of Lesko's participation in the crimes, which overwhelmingly demonstrated Lesko's specific intent to kill. The Commonwealth contends that Lesko's own words "hit him again," as related by Rutherford at trial, speak most loudly "of Lesko's full and active participation in the crime." *Id.* at 31.

With respect to the Commonwealth's failure to disclose the juvenile records of Rutherford showing that he was granted two four-hour furloughs (at Thanksgiving and at Christmas), that he had a psychological condition, and that the Commonwealth thought it was "too risky" to try him before trying Lesko and Travaglia, the Commonwealth asserts that this evidence likewise would not have changed the outcome of the trial. The Commonwealth notes that Rutherford had given an incriminating statement **prior** to being granted a furlough, and even if the furloughs could be offered as proof of a *quid pro quo* for Rutherford's trial testimony, the effect of impeaching Rutherford would have made little impact in light of his testimony as an eyewitness and co-conspirator in the killing of Nicholls. The Commonwealth further maintains that it would not have been in Lesko's self-interest to impeach Rutherford since Rutherford's testimony "provided critical evidence concerning Travaglia's drug abuse which would have inured to the benefit of Lesko as well," *id.* at 38, presumably by offering the prospect of lessening Lesko's culpability as an accomplice.

Finally, regarding the alleged failure by the Commonwealth to provide Lesko with a copy of its agreement not to prosecute Montgomery for certain property crimes—namely, robber-

ies—he allegedly committed with Travaglia, the Commonwealth argues that "Lesko has not established he was not given the agreement or the equivalent of the agreement in the March 26, 1980 statement [within which counsel for Montgomery refers to the agreement as relating to crimes against property but not as to crimes against people]." *Id.* at 33. The Commonwealth further argues that the agreement would not have been useful for impeaching Montgomery because Montgomery had denied committing the crimes at the 1981 trial, and, furthermore, that such impeachment would have necessarily implicated Travaglia, which might have reflected poorly on Lesko.

In *Brady,* the U.S. Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. 1194. The duty to disclose may encompass impeachment evidence as well as directly exculpatory evidence. *Commonwealth v. Lambert,* 584 Pa. 461, 884 A.2d 848, 854 (2005). Furthermore, in *Burke,* we applied the U.S. Supreme Court's later decision in *Kyles,* concluding that the prosecution's duty when faced with a *Brady* request extends to exculpatory evidence in the files of police agencies of the same government prosecuting the case. With regard to the issue of materiality, evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. *Lambert, supra; see also Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 577–78 (2005) (to establish *Brady* violation, defendant "must establish that there has been a suppression by the prosecution of either exculpatory or impeachment evidence that was favorable to the accused, and that the omission of such evidence prejudiced the defendant"). However, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense." *Chambers,* 807 A.2d at 887.

Lesko's *Brady* claims pertain to alleged impeachment evidence which he contends would have been useful in challenging at trial and at the resentencing hearing witness testimony that provided the basis for a finding that Lesko "intended" to kill Officer Miller, which was necessary to prove guilt for first-degree murder.

We will first consider the *Brady* claims as they relate to the guilt phase. With regard to the Montgomery written agreement and Rutherford's juvenile records, we conclude that the claims are time-barred. Lesko proceeded below upon a theory that he was entitled to pursue his guilt-related claims in an of-right PCRA petition, and he made no effort to invoke or satisfy any of the PCRA's time-bar exceptions. Thus, Lesko never stated when this information became available to him, nor did he claim that he raised the issues within sixty days of the date they first could have been presented under 42 Pa.C.S. § 9545(b)(2).

Furthermore, it is apparent from the existing record that these two claims are time-barred. Lesko's own averments and the findings of the PCRA court (which incorporated an ineffectiveness of counsel aspect regarding these two averments as discussed above) indicate that trial counsel had knowledge of the Montgomery agreement prior to the 1981 trial and, as discussed below, trial counsel clearly had knowledge that Rutherford had an agreement with the Commonwealth at Lesko's 1995 resentencing. Accordingly, given our conclusion that any errors related to the 1981 conviction are subject to the serial petition restrictions of the PCRA, and the fact that these *Brady* claims are unavailable under the PCRA's time-bar exceptions, we conclude that the PCRA court lacked jurisdiction to consider these two claims as they relate to the guilt phase.

The analysis regarding the Steffee report is different as it does not appear that Lesko received this report until after the second penalty hearing, after the PCRA petition was filed, and before the PCRA hearing. The PCRA court specifically determined that Lesko's present counsel first learned of

the contents of the report when he subpoenaed the records of the Pennsylvania State Police in preparation for the PCRA hearing and noted that the Commonwealth raised no objection on this point. Thus, unlike the prior two pieces of information, we have jurisdiction to review this claim as it relates to Lesko's guilt phase. Nevertheless, the PCRA court's reasoning underlying its grant of relief on this claim was erroneous as a matter of law.

Preliminarily, we note that, in finding that the Commonwealth violated *Brady,* the PCRA court relied upon the U.S. Supreme Court's decision in *Kyles,* a case that was decided many years after Lesko's trial. *Kyles* extended *Brady* to encompass evidence contained within the control of the relevant government and not just material possessed by the prosecutor. Neither the U.S. Supreme Court nor this Court has specifically answered the question whether the *Kyles* rule applies retroactively to pre-*Kyles* trials. *See Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1127 n. 14 (2008) (noting that prior to *Burke* this Court maintained that district attorneys were not required to provide defense with evidence it did not possess and of which it was unaware, such as evidence exclusively within police custody). We need not answer the question here because, we hold, Lesko cannot establish materiality in the constitutional sense. *See Commonwealth v. Pagan,* 597 Pa. 69, 950 A.2d 270, 291–92 (2008) (explaining competing positions for applying *Kyles* to pre-*Kyles* trial, but assuming for purposes of decision alone that *Kyles* applies since, in any event, appellant could not establish that evidence was exculpatory).[15]

 In order to prevail on a *Brady* claim, the defendant must establish that the evidence requested and allegedly withheld was material. Evidence is material "if there is

---

**15.** We note also that the Commonwealth's *Brady* obligations can be cabined by the nature of the discovery request. In this pre-*Kyles* case, Lesko's counsel requested all evidence "favorable to the accused which is material either to guilt or to punishment in the possession or direct control of the attorney of the Commonwealth." Lesko did not ask for information in the control of the police or of the prosecuting authority generally.

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Lambert*, 884 A.2d at 854. Although the Steffee report contained a statement by Montgomery denying any knowledge (*i.e.*, he didn't "know anything about the cop getting shot"), which could have been used to impeach Montgomery's testimony at trial that Lesko stated he "wanted to" shoot a police officer, we cannot agree with Lesko and the PCRA court that there was a reasonable probability that this information, had it been disclosed and employed as impeachment at trial, would have led to a different result.

The issue of Lesko's intent was hotly contested at trial. The evidence showed that Travaglia was the triggerman and both men forwarded a defense that the murder of Officer Miller was not premeditated. Faced with such a defense, the Commonwealth did not limit its proof of Lesko's intent to the testimony of Montgomery, but also presented evidence that Lesko and Travaglia jointly embarked on a crime spree on the night of Officer Miller's murder, which began with the kidnapping and carjacking of William Nicholls. At the time they goaded Officer Miller into stopping Nicholls' car, the confederates had already murdered Nicholls and possessed damning evidence of their involvement in that murder. The evidence also showed that Lesko participated in the theft of Travaglia's father's gun—the gun that was used to kill Officer Miller—and that Lesko and Travaglia intended to rob an Apollo Stop N' Go store. That intention was thwarted by Officer Miller, who was parked directly across from the store. N.T., Volume I, 1981, at 358–60, 368–70, 373, 615–18. The account in the Steffee report would have been useful as impeachment by omission, of course. But, Montgomery's earlier non-cooperation with police would not have made his in-court testimony disappear, nor would it have altered the overall volume of abundant, independent evidence offered at the 1981 trial establishing Lesko's course of conduct and intent.[16] Lesko has

16. Notably, Lesko has not suggested what Montgomery would have said if confronted with his earlier claim that he knew nothing of the shooting.

not shown a reasonable probability that the result of the guilt phase would have been different if only trial counsel had been able to use the omission in the Steffee report to impeach Montgomery's in-court testimony.

Turning to the *Brady* claims as they relate to Lesko's second penalty hearing, both Montgomery and Rutherford testified at this proceeding and, again, none of this information was used to impeach their testimony. Significantly, in addressing the *Brady* claims, the PCRA court did not conclude that evidence of the Steffee report, the Commonwealth's agreement with Montgomery, or the juvenile files of Rutherford, if such had been provided to the defense, independently would have resulted in a different outcome. Rather, the PCRA court determined that it was the cumulative prejudice from the Commonwealth's failure to produce relevant impeachment evidence, combined with the prejudice arising from counsel's failure to interview witnesses and gather relevant impeachment information, which resulted in a reasonable probability that "the outcome of the proceedings—that the jury found the Petitioner to have the requisite intent—would have been different, but for these errors." PCRA Court Opinion, 8/7/06, at 46.

The PCRA court's guilt-phase reasoning on this issue, however, does not readily translate to the resentencing. The PCRA court focused on the fact that this testimony was used to establish the intent to kill necessary for first-degree murder. Intent to kill, however, was not an issue at the resentencing. At the resentencing, the testimony was offered merely as background to establish the circumstances of the crime giving rise to the jury's penalty phase duty. This background was not used to prove the existence of any aggravating circumstances, but was merely used to put the case in context for the jury. Thus, the PCRA court's reasoning in support of its grant of guilt phase relief is not relevant or persuasive in the task of assessing *Brady* prejudice at the resentencing.

 In any event, at the resentencing, trial counsel elicited testimony from Montgomery that he had committed robberies with Travaglia prior to the murder of Officer Miller, N.T., 2/14/95, at 487; and trial counsel similarly elicited testimony from Rutherford that he had a deal with the Commonwealth that he would be tried as a juvenile for the Nicholls murder and that the charges against him were ultimately dismissed, N.T., 2/13/1995, at 454. Indeed, trial counsel requested and the jury was given a corrupt source instruction regarding Rutherford's testimony. N.T., 2/17/95, at 19. For these reasons, we conclude that the PCRA court erred in holding that the result of the resentencing proceeding would have been different if counsel had impeached Montgomery and Rutherford with the *Brady* information.

### III. PENALTY PHASE CLAIMS

 The remaining claims allege ineffective assistance of resentencing counsel. In order to obtain relief based on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Pennsylvania, we have applied the *Strickland* test by looking to three elements. Thus, in order to succeed on a claim of ineffectiveness, the petitioner must establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973, 975 (1987). Additionally, we note, the Sixth Amendment right to counsel is recognized "not for its own sake," but because of the effect it has on the accused's right to a fair trial. *See Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *see also Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 ("Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation.... The purpose is simply to

ensure that criminal defendants receive a fair trial."). For these reasons, counsel is presumed to have rendered effective assistance. Both the U.S. Supreme Court and this Court have made clear that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first. *Strickland, supra; Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998).

In granting Lesko penalty phase relief, the PCRA court found merit to Lesko's claims that trial counsel was ineffective for failing to retain an appropriate mental health expert to examine Lesko, failing to provide relevant information to the mental health expert who was retained, and failing to adequately develop and present mitigation evidence. The PCRA court denied relief on the remaining claims Lesko raised related to the second penalty hearing and he has filed a protective cross-appeal raising the claims on which he was denied relief.

We first note that, in contrast to Lesko's claims relating to his 1981 guilt trial, Lesko's claims of error with respect to his second sentencing proceeding, including his ineffectiveness of counsel claims, are timely. As discussed previously, in 1995 Lesko was resentenced to death following a sentencing proceeding compelled by the federal court's conditional grant of *habeas* relief. His new sentence became final after this Court affirmed the judgment on direct appeal in 1998 and the U.S. Supreme Court denied his petition for *certiorari* on January 19, 1999. Lesko filed his PCRA petition on February 10, 1999, which was within one year of the date his new judgment of sentence became final, and the PCRA court thus had jurisdiction to address Lesko's collateral challenges related to his 1995 resentencing proceeding.

## A. Application of Pa.R.Crim.P. 801

The Commonwealth asserts that the PCRA court erroneously applied present-day attorney competency standards,

namely, Rule 801 of the Pennsylvania Rules of Criminal Procedure, to determine the competency of counsel at Lesko's second sentencing in 1995. Rule 801, which became effective in 2004, sets forth the qualifications for defense counsel in capital cases. In its opinion and order, the PCRA court set forth the language of Rule 801, and opined that the new standards enumerated the elements for adequate capital case representation. Nevertheless, the PCRA court specifically noted that "this rule was not effective or binding upon Mr. Marsh during the time he represented [Lesko]," and stated that it was merely recognizing "the heightened standard of representation that our highest court now demands of attorneys who are involved in capital cases. . . ." PCRA Court Opinion, 8/7/06, at 8–9.

From the PCRA court's statement, the Commonwealth argues that "[i]t is clear that the lower court improperly framed its analysis of the issues relating to ineffectiveness." Brief of Appellant Commonwealth at 19. The Commonwealth overlooks, however, that the PCRA court specifically acknowledged that it would not apply the Rule 801 standards to Lesko's trial counsel. Furthermore, the Commonwealth fails to identify any particular instance where the PCRA court analyzed a specific ineffectiveness claim under improper standards. Accordingly, the Commonwealth's generalized Rule 801 complaint is without merit.

### B. Capital Resentencing

Before turning to the penalty phase claims upon which Lesko was granted relief, we will first address Lesko's claim that a death sentence should not have been deemed available at all following the federal *habeas* court's order. Lesko contends that resentencing counsel was ineffective for failing to argue, after the conditional grant of *habeas corpus* sentencing relief in 1991, that "any capital resentencing would violate his life and liberty interest in the imposition of a life sentence following the reversal of his prior death sentence." Brief of Appellant Lesko at 15. Lesko acknowledges that on the direct appeal of his resentencing, this Court rejected his

argument that subjecting him to resentencing under the 1988 amendment to 42 Pa.C.S. § 9711(h)(4) constituted an *ex post facto* application of the law and a violation of due process. *See Lesko*, 719 A.2d at 220. But, Lesko asserts that his current theory of objection to capital eligibility "is materially distinct" from the claim raised on that appeal. Specifically, Lesko argues that if this Court had correctly granted him relief on his original direct appeal in 1983, he would have received a life sentence on remand by operation of law since at that time Section 9711(h) "vested in a capital defendant the right to a life sentence if his death sentence was overturned upon appeal." Brief of Appellant Lesko at 15. He further argues that trial counsel had no reasonable basis for "failing to raise the life and liberty interest argument" following the federal "reversal" of his first death sentence, and that counsel's failure to do so prejudiced him. *Id.* at 17.

The PCRA court rejected this claim on the basis that it was previously litigated. PCRA Court Opinion, 8/7/06, at 65–66.

Lesko is seeking to obtain relief on a previously rejected claim by casting it in terms of ineffectiveness, and faulting counsel for failing to forward a different theory. This Court has recognized that a Sixth Amendment claim of ineffectiveness raises a distinct ground for relief and thus this manner of presenting new theories on collateral attack is not *per se* precluded by the PCRA's previous litigation restriction. *Collins*, 888 A.2d at 571. Nevertheless, we conclude that his attack on appeal counsel based on his new theory fails on the merits for the reasons expressed on direct appeal.

In rejecting Lesko's claim on his resentencing appeal, this Court acknowledged that under the prior capital sentencing statute, if this Court found an error in the penalty phase, a remand for imposition of a sentence of life imprisonment would have been required. We then explained that the statute was amended in 1988 to provide that a new sentencing hearing must be conducted whenever a sentence of death is vacated, except where it is vacated for disproportionality or lack of evidence of aggravating factors. 42 Pa.C.S. § 9711(h)(4). Finally, we noted that we had already rejected,

in other cases, the same argument as that made by Lesko and had concluded that the revised sentencing provision could be applied to cases that were pending in the appellate process at the time of the amendment. *Lesko*, 719 A.2d at 219–20 (case citations omitted).

Lesko does not explain how his current ineffectiveness claim can survive the reasoning of this Court in his direct appeal. He fails to provide any argument as to how counsel fell short in his presentation of this claim on direct appeal except to assert that counsel should have presented a "life and liberty" argument in support of the same claim. Such an argument does not change the jurisprudential nature of the claim that counsel presented on direct appeal. Furthermore, Lesko's new claim, as stated, is meritless since he speaks of a "life and liberty" interest that supposedly matured following the federal court's "reversal" of his prior death sentence. But, as we have pointed out at some length above, a conditional grant of coercive, collateral federal *habeas corpus* relief is not a "reversal" of a state court judgment. Nor does a lower federal court's conditional *habeas* order prove that this Court's affirmance of the initial death sentence was "incorrect."

In any event, the interest of which Lesko speaks, if it existed at all, was a function and part of Pennsylvania's direct review scheme, and Lesko's success on collateral review in federal court is simply not the same thing as success on direct review in this Court. Lesko went to federal court, seeking the civil relief available in federal *habeas* proceedings; and Pennsylvania afforded him precisely the conditional relief that was ordered. He was entitled to no more. Finally, even if this Court were to agree that counsel's presentation of this claim was lacking on direct appeal, we note that this Court has repeatedly rejected the argument that "retroactive" application of § 9711(h)(4) offends a defendant's due process and equal protection rights, *see Commonwealth v. Chambers*, 546 Pa. 370, 685 A.2d 96, 101 (1996), and has held that application of § 9711(h)(4) is constitutionally permissible. *Commonwealth v. Young*, 536 Pa. 57, 66, 637 A.2d 1313, 1317 (1993) (rejecting appellant's argument that retroactive application of

§ 9711(h) "deprived him of the right to have his death sentence automatically modified to life imprisonment and the right not to face the possibility of a death sentence"). Lesko's "life and liberty" theory is of no discernible, qualitative difference. Accordingly, Lesko's underlying argument is without merit, counsel was not ineffective, and the death penalty was an available sentence at the time of his second sentencing proceeding. We now turn to a consideration of trial counsel's performance during that proceeding.

## C. Failure to Present Additional Mitigating Evidence

■ The PCRA court granted penalty phase relief on two different bases related to trial counsel's failure to present additional mitigating evidence. The first basis related to expert testimony that Lesko contends should have been presented and the second basis related to additional mitigating evidence that Lesko avers should have been discovered and presented. As these bases provided distinct grounds for relief in the PCRA court's opinion, they will be discussed separately herein. We find that Lesko has not established that counsel's performance was constitutionally deficient. Alternatively, we conclude that Lesko has not established *Strickland* prejudice. In that alternative assessment of prejudice, we will examine whether both grounds considered by the PCRA court, when considered together, would command a finding of prejudice. *See, e.g., Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009) ("[I]f multiple instances of deficient performance are found, the assessment of prejudice properly may be premised on cumulation.").

Respecting the expert testimony claim, the Commonwealth argues that the PCRA court erred in granting Lesko a new penalty phase based on his claims that trial counsel was ineffective for, *inter alia*, (1) failing to retain an expert, namely, a neuropsychologist, who could have provided a reliable evaluation of Lesko's mental health and/or organic brain damage; and (2) retaining a clinical psychologist under circumstances, *i.e.*, insufficient preparation time and lack of material collateral information, which precluded the expert

from conducting an appropriate evaluation and reaching a reliable diagnosis.

In addressing Lesko's claims, the PCRA court was persuaded by the fact that three years before the 1995 resentencing, trial counsel consulted University of Pittsburgh law professor Welsh White, Esquire, who provided counsel with literature linking child abuse to organic brain damage. Professor White also provided counsel with a sample motion to obtain psychological and neuropsychological testing of Lesko. Counsel agreed that this information would have been important to present to the jury. The PCRA court found that it was significant that counsel did not consult a neuropsychologist, but instead retained a clinical psychologist, Herbert Levit, Ph.D., on February 6, 1995, and did so only after jury selection had already begun for the resentencing and only three days before the resentencing trial commenced. Furthermore, the PCRA court noted that trial counsel did not specifically advise Dr. Levit that he knew of the link between abuse and organic brain damage, and that it may provide an area of relevant inquiry. As a result, the PCRA court determined that Dr. Levit conducted a standard mental status examination, which was not designed to detect either cognitive or organic brain dysfunction. PCRA Court Opinion, 8/7/06, at 11.

In granting a new penalty hearing, the PCRA court also considered the information that Dr. Levit did not review, which included any prior psychological or psychiatric evaluations, trial transcripts or any of the discovery materials from the first proceeding, or any of the information in the Children and Youth Services (hereafter "CYS") records that contained information concerning Lesko's life history. The PCRA court determined that Dr. Levit's expert opinion was based upon limited information.

In contrast, at the PCRA hearing, Lesko presented the testimony of Dr. Barry Crown, a neuropsychologist, who testified that both the institutional records and Dr. Levit's evaluation contained indicia of brain damage that would have been revealed with neuropsychological testing tools and a properly qualified and competent evaluator. Dr. Crown de-

tailed at length his opinion of which records would be red flags to one trained to find organic brain damage. On further examination by the PCRA court, Dr. Crown opined that he would have expected Dr. Levit to have responded to the red flags and suggested neuropsychological testing as the "prudent thing to do." In Dr. Crown's view, such red flags included Lesko's unusual gait, exhibiting some form of psychomotor difficulty at an early age; Lesko's experience in uninhabitable and deplorable housing conditions; the general and continuous neglect of Lesko's and his siblings' health; and the fact that he was set on fire by boys in the neighborhood, which resulted in a one-month stay in the hospital. Dr. Crown explained that these childhood circumstances were significant because the combination of "general neglect" and "a young child under stress, we know ... produces difficulties at critical stages in brain development." N.T., 3/22/01, at 403, 404, 407, and 412, 448–49.

Dr. Crown also enumerated significant facts that he said were contained in the records: *e.g.*, Lesko suffered from childhood insomnia, hyperactivity and headaches; he was described as having "episodic dyscontrol," a form of organically impaired impulse control; he chronically suffered from inadequate nutrition; his mother was a chronic drinker, indicating that Lesko may have been subject to fetal alcohol involvement; a long and continuing history of high fevers and ear problems; and multiple indications of head trauma. The records also contained references to a long history of voluntary drug and alcohol abuse and exposure to environmental toxins. Furthermore, Dr. Crown noted that the records disclosed a history of blackouts, which would also indicate alcohol-related brain cell damage. According to Dr. Crown, this information should have alerted Dr. Levit that neuropsychological testing was warranted.

Dr. Crown also offered his opinion of the information provided by Dr. Levit, opining that the results of the Wechsler Adult Intelligence Scale ("WAIS") intelligence test that was administered by Dr. Levit revealed neuropsychologically significant evidence of brain damage. According to Dr. Crown,

not only did the test scoring suggest the need for further testing, but it was itself "a pathognomic sign[, m]eaning that it represents the very strong possibility and likelihood of a pathology, of an impairment, of a deficit" and "would be an extremely strong indicator of ... the strong likelihood of organic brain damage." N.T., 3/22/01, at 383. Similarly, the results of Dr. Levit's administration of the Bender Visual Motor Gestalt Test and the House–Tree–Person Test provided data that Dr. Crown believed suggested the need for further neuropsychological testing. Dr. Crown also testified that Dr. Levit's diagnosis of Borderline Personality Disorder raised important issues relating to the possibility of brain damage, since the symptoms of Borderline Personality Disorder substantially overlap the behavioral manifestations of organic brain damage. Accordingly, in Dr. Crown's opinion, Dr. Levit's diagnosis, although limited, was yet another sign that Lesko was suffering from organic brain damage.

In its opinion, the PCRA court also noted that the CYS records (that were not provided to the defense until the April 2002 PCRA hearing) contained substantial evidence to support a conclusion that further neuropsychological testing was indicated. Among the indicators were the results of intelligence tests by school psychologists that were significantly similar to the most recent test results, and evidence that Lesko's siblings also suffered from brain damage, dysfunction and mental retardation.

Finally, the PCRA court noted that Dr. Crown had administered a complete neuropsychological test battery to Lesko. As a result of those tests, Dr. Crown concluded to a reasonable degree of neuropsychological certainty that Lesko was brain damaged, and was brain damaged at the time of this murder. Dr. Crown offered an opinion that the type of brain damage he detected supported two mitigating circumstances-that Lesko suffered from an extreme emotional disturbance, 42 Pa.C.S. § 9711(e)(2), and that he had a significant impairment in his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, 42 Pa.C.S. § 9711(e)(3). The PCRA court further noted that the

Commonwealth did not offer any expert testimony in opposition to Dr. Crown's diagnosis and was unable to discredit Dr. Crown's methodology or conclusions on cross-examination.

Based on the foregoing, the PCRA court concluded that, "the testimony of a neuropsychologist at the sentencing hearing with regard to [Lesko's] organic brain damage would have added significant additional and relevant information for the jury to consider as it weighed mitigating factors against the aggravating factors." PCRA Court Opinion, 8/7/06, at 16. The court then framed the question relating to counsel's strategy and performance as whether counsel had any reasonable basis for having retained a clinical psychologist rather than a neuropsychologist to develop the mental health mitigation. Concluding that trial counsel had offered no reason for failing to hire a neuropsychologist, despite Professor White's guidance, the court concluded that trial counsel did not act "responsibly". *See id.* at 20. Finally, the PCRA court concluded that trial counsel presented a "paltry" amount of mitigating evidence, when measured against the overwhelming amount of evidence that counsel could have presented, and then awarded Lesko a new penalty hearing.

Turning to the appellate arguments presented by the Commonwealth, the first assertion is directed at the reasonableness of trial counsel's conduct. The Commonwealth suggests that counsel purposely waited until the last minute to secure Dr. Levit so that Dr. Levit's testimony that Lesko suffered from polysubstance abuse, a borderline personality disorder, and a poor upbringing could be "sprung" on the Commonwealth, which would then be denied the opportunity to retain its own expert to evaluate Lesko in an attempt to rebut Dr. Levit's medical opinion.

With respect to the PCRA court's determination that trial counsel was ineffective for failing to retain the services of a neuropsychologist to present evidence that Lesko suffered from organic brain damage, the Commonwealth points out that Lesko was examined by mental health professionals in Indiana County and Westmoreland County, and neither offered any indication that Lesko was brain damaged. The

Commonwealth further contends that any fault in failing to raise the issue of organic brain damage "should be at the feet of Dr. Levit who was the retained expert. If Dr. Levit had insufficient information, that fact should have been made known to [counsel] who would have taken appropriate action." With respect to Lesko's claim that counsel failed to recognize the relationship between child neglect and child abuse and brain damage, and thereby failed to direct Dr. Levit to undertake such an inquiry, the Commonwealth responds "it is not the function of trial counsel to play mental health expert and direct the expert. Rather, the precise point of hiring an expert is to permit him to investigate and evaluate the case as the expert sees fit." Brief of the Commonwealth, at 54–55, 57.

The Commonwealth also disputes the PCRA court's finding that Lesko was prejudiced by counsel's failure to present a neuropsychologist at Lesko's resentencing, asserting that Lesko failed to show that testimony such as that proffered by Dr. Crown would have offered "a potential for success substantially greater than the course actually pursued." *Id.* at 54 (emphasis omitted). In support of its position, the Commonwealth notes that Dr. Levit causally related Lesko's disorder to genetics and the extremely dysfunctional nature of his upbringing. According to the Commonwealth, Dr. Crown's opinion that Lesko suffers from brain damage "is merely to take the same facts and attach an additional label to them." *Id.* at 51.

The PCRA court's opinion is detailed and thoughtful in almost all regards on the instant issue and, indeed, on most of the issues it addressed. Nevertheless, we find multiple errors in the PCRA court's analysis of this question, since it placed the burden of an expert's knowledge on counsel's shoulders and framed the reasonable strategy question narrowly without considering the course actually pursued by counsel at the resentencing.

When evaluating ineffectiveness claims, "judicial scrutiny of counsel's performance must be highly deferential." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Indeed, few

tenets are better settled than the presumption that counsel is effective. *Commonwealth v. Daniels,* 600 Pa. 1, 963 A.2d 409, 427 (2009). This presumption arises from the recognition that it is all too easy for the defendant or the court to second-guess a strategy that has proven unsuccessful. Rather, a reviewing court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Puksar,* 597 Pa. 240, 951 A.2d 267, 277 (2008) (*quoting Commonwealth v. Miller,* 572 Pa. 623, 819 A.2d 504, 517 (2002)). The U.S. Supreme Court explained a reviewing court's role in making this determination when it stated:

> [t]he court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in a particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

But, it is also well-settled under the Sixth Amendment that capital counsel has an obligation to conduct a reasonably thorough investigation for mitigating evidence or to make reasonable decisions that make further investigation unnecessary. *Commonwealth v. Sattazahn,* 597 Pa. 648, 952 A.2d 640, 655 (2008). In evaluating a claim of constitutional deficiency in investigating and presenting mitigation evidence, we consider a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented. *Collins,* 888 A.2d at 580. None of these factors is, by itself, dispositive, because

even if the investigation conducted by counsel was unreasonable, this fact alone will not result in relief if the defendant cannot demonstrate that he was prejudiced by counsel's conduct. *Id.*

The U.S. Supreme Court recently clarified the interaction between the performance and prejudice prongs of *Strickland* in instances where there was a finding that counsel's investigation was unreasonable. *See Sears v. Upton,* —— U.S. ——, 130 S.Ct. 3259, 177 L.Ed.2d 1025 (2010). In *Sears,* trial counsel employed a mitigation strategy of showing that Sears was from a stable, middle class family, who were shocked and dismayed by his actions and who would be devastated by the imposition of a death sentence. On collateral review, evidence emerged showing that Sears came from an abusive home life, had behavior problems from a very young age, and suffered from "significant frontal lobe abnormalities." *Id.* at 3262. None of this evidence, however, was known to trial counsel, and the state post-conviction court determined that counsel's investigation was inadequate.[17] The state post-conviction court, however, did not grant relief because counsel had presented a mitigation theory with evidence to support it. Thus, the court concluded that Sears had "failed to meet his burden of proving that there is a reasonable likelihood that the outcome at trial would have been different if a different mitigation theory had been advanced." *Id.* at 3264–65 (*citing* state post-conviction court opinion).

In vacating the state court, the High Court explained that if the reviewing court determines that counsel's investigation was unreasonable, a "more probing prejudice" inquiry may be necessary, because a finding that counsel had conducted a constitutionally deficient investigation should call into question the reasonableness of the theory or theories that counsel pursued in mitigation. *See id.* at 3265. Explaining this point further, the Court indicated that pursuing a theory that might be reasonable in the abstract, "does not obviate the need to analyze whether counsel's failure to conduct an adequate

17. The Supreme Court of Georgia summarily denied review of the claim.

mitigation investigation before arriving at whether this particular theory prejudiced [the appellant]. .... Sears might be prejudiced by his counsel's failures, whether his haphazard choice was reasonable or not." *Id.* In light of these teachings, we first concern ourselves with counsel's performance, *i.e.,* whether counsel conducted an adequate mitigation investigation.

We begin by noting that this is not an instance where counsel failed to conduct any investigation and presented limited mitigating evidence, *see Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 787–88 (2004); nor is it a case where counsel conducted minimal investigation and failed to uncover evidence that was immediately available to him. Instead, it is a case where counsel undertook a reasonable investigation and presented a compelling and partly successful case in mitigation, albeit the defense case did not ultimately carry the day.

Counsel presented the testimony of Dr. Levit, a clinical and forensic psychologist, at the resentencing hearing. Counsel established that Dr. Levit had been qualified as an expert witness in "several hundred" court proceedings and had "testified in many dozens of battered women homicides, have [sic] seen other types of homicide cases." Dr. Levit testified that he interviewed Lesko and his family members, reviewed the available social history, and conducted psychological testing of Lesko. He also stated that one of the tests administered was sensitive to neurological impairment and was used to determine whether or not there was any organic brain damage. Dr. Levit opined that Lesko's mental deficiencies were a combination of perhaps some genetic problems and his distressing home life. Additionally, he diagnosed Lesko with a borderline personality disorder resulting in extremely erratic and explosive behavior. Dr. Levit also opined that at the time the murders occurred, Lesko was suffering from voluntary polysubstance abuse, which included the use of illicit drugs and the excessive use of alcohol. As a direct result of Dr. Levit's testimony, the jury found as a mitigating circumstance that Lesko was under the influence of extreme emotional or

mental disturbance, 42 Pa.C.S. § 9711(e)(2). N.T., 2/15/1995, at 681, 685–86, 694, 701, 703–04.

Trial counsel also presented extensive social history through the testimony of a forensic social worker, Lois Nardone, and this information was given to Dr. Levit for purposes of diagnosis. Ms. Nardone, like Dr. Levit, testified that she conducted a number of interviews with Lesko and his family members as well as other persons involved in Lesko's life. Significantly, Ms. Nardone testified that Lesko was abused by his grandfather every day; his mother was extremely promiscuous and had sex with strange men in front of her children; his mother left the children unattended for days at a time; his housing conditions were "deplorable;" at the age of five Lesko was set on fire by another child and was hospitalized for thirty-three days; at age six Lesko was sexually molested by a man; and Lesko and his siblings were frequently left unfed, dirty, and not properly clothed. N.T., 2/14/1995, at 582, 585–88. This small sampling of Ms. Nardone's testimony gives a sense of what led to the jury's determination that Lesko had a horrible childhood under the statutory catchall mitigator, 42 Pa.C.S. § 9711(e)(8). Contrary to the PCRA court's legal findings, and mindful of the deference due to counsel, we believe that the record shows that trial counsel undertook a reasonable investigation, presenting an extensive psychological and social history in support of specific statutory mitigators, which made "the adversarial testing process work in [this] particular case;" in short, counsel "chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Strickland, supra; Puksar, supra.*

To the extent that the PCRA court specifically faulted trial counsel for failing to consult with a neuropsychologist, we caution that, in applying *Strickland,* courts must be careful not to conflate the roles and professional obligations of experts and lawyers. In this regard, it is telling that Dr. Crown's testimony at the PCRA hearing was directed at the examination conducted by Dr. Levit and not the strategy of counsel; thus, Dr. Crown opined that the results of some of the testing conducted by Dr. Levit raised "red flags," which indicated that

neuropsychological testing should be conducted. Certainly, these psychological "red flags" could not be directed at counsel, who was unschooled in mental health matters, but were directed at Dr. Levit. In fact, by the neuropsychologist's own testimony, the diagnosis of Borderline Personality Disorder— a diagnosis made by Dr. Levit, not trial counsel—should have raised a question relating to the possibility of brain damage. Again, such opinions, if valid, may call into question Dr. Levit's professional performance, but that is not the same thing as providing a basis to fault trial counsel's legal performance.

The CO/DO posits that trial counsel should have provided Dr. Levit with additional documents of Lesko's childhood abuse and neglect and such documents may have resulted in new or additional diagnoses of Lesko, including probable brain damage and substantial impairment in the capacity to appreciate the criminality of his conduct. The record shows, however, that Dr. Levit possessed information related to Lesko's childhood abuse and neglect and that he used that information in forming his opinion. *See id.* at 685–86, 701–04. Additionally, Dr. Levit testified that Lesko was unable to conform his conduct to the requirements of the law, opining that Lesko's "capacity to formulate good judgmental decisions" was highly questionable and that his ability to conform to the requirements of the law "was justly impaired." *Id.* at 705–06.[18] Accordingly, and again mindful of the deference to counsel that *Strickland* commands, we find that Lesko has failed to sustain his burden of proving the performance prong of *Strickland.* We note also that this case is distinct from the

18. The focus of the CO/DO, like the PCRA court, is on what counsel did not do and allegedly should have done, including his failure to alert Dr. Levit as to the possibility of organic brain damage. This focus gives little notice to the course actually pursued by counsel. As discussed herein, in considering the reasonableness of penalty phase counsel's strategy, the course actually pursued by counsel must be one of the factors to consider. Additionally, as detailed *infra*, much of Dr. Crown's testimony at the PCRA hearing suggested that there were signs that neuropsychological testing was indicated based on the results of the tests Dr. Levit actually administered. Dr. Levit's alleged incompetence is a centerpiece of Lesko's claim; but, to place the expert's alleged error at counsel's feet unmoors the analysis from *Strickland.*

situation the High Court addressed in its recent *Sears* opinion because we find that counsel's mitigation investigation and performance were reasonable under the Sixth Amendment.

█ Furthermore, even if we were to accept the PCRA court's conclusion that counsel's investigation was unreasonable and constitutionally deficient, and that there was some basis in law to say that lawyers are obliged to consult neuropsychologists, rather than clinical psychologists, in circumstances like these, we do not agree with the PCRA court that Lesko established that he was prejudiced under *Strickland*.

█ The *Strickland* test for prejudice requires the defendant to prove **actual prejudice,** that is, a reasonable probability that, but for counsel's lapse, the result of the penalty proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "In making this determination, a court hearing an ineffectiveness claim must consider the **totality of the evidence** before the judge or jury.... Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 695–96, 104 S.Ct. 2052 (emphasis added). Ultimately, a reviewing court must question the reliability of the proceedings and ask whether "the result of the particular proceeding [was] unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696, 104 S.Ct. 2052. Notably, in applying these concepts to the case before it, the *Strickland* Court ultimately determined that additional evidence of "numerous people" who thought the defendant Washington was a good person and the fact that a psychiatrist and a psychologist believed he was under considerable emotional stress did not establish a reasonable probability that the outcome of the penalty proceeding would have been different, given the overwhelming aggravating factors presented. *Id.* at 700, 104 S.Ct. 2052. In our view, Lesko has not established that the resentencing proceeding was rendered unreliable by counsel's alleged lapse. This was a jury that found four mitigating factors, relating to two distinct statutory

mitigating circumstances. Thus, the jury was engaged in a balancing of aggravators and mitigators, yet voted for death (just as Lesko's first sentencing jury had). To find *Strickland* prejudice arising from the failure alleged herein, we must conclude that "there is a reasonable probability that, absent counsel's failure to present the mitigation evidence he currently proffers, [Lesko] would have been able to prove at least one [more] mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s)." *Commonwealth v. Brown,* 582 Pa. 461, 872 A.2d 1139, 1150–51 (2005) (citing 42 Pa.C.S. § 9711(c)).

The U.S. Supreme Court recently applied the *Strickland* prejudice test in a context involving a defendant who, like Lesko, had committed multiple, heinous crimes. *See Smith v. Spisak,* —— U.S. ——, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010). In analyzing Spisak's claim that his trial counsel's closing argument was constitutionally inadequate, the Court reiterated the *Strickland* standard discussed herein and presumed, for "present purposes," that counsel's performance was inadequate. Nevertheless, the Court concluded that there was not a reasonable probability that a better closing argument would have made a significant difference in the outcome. In reaching this conclusion, the Court considered the context of the case, which included Spisak's admission and supporting testimony that he committed three murders and attempted to commit two others. The Court stressed that at the time of the sentencing the jurors had fresh in their minds the government's evidence regarding the killings as well as Spisak's "boastful and unrepentant confessions and his threats to commit further acts of violence." The Court also noted that the defense experts' testimony, which was offered to show that Spisak suffered from a mental infirmity, was fresh in the jurors' minds; and, the Court did not "see how it could have made a significant difference had counsel gone beyond his actual argument—which emphasized mental illness as a mitigating factor and referred the jury to the experts' testimony—

by repeating the facts or connections that the experts had just described." *Id.* at 687–88. Notably, even the concurrence by Justice Stevens, which stressed "how thoroughly egregious counsel's closing argument was," ultimately concluded that Spisak was not entitled to relief in light of Spisak's testimony and his "monstrous" crimes. *Id.* at 693.

The case *sub judice* obviously is not on all fours with the situation in *Spisak*. Most importantly, in this case we consider a claim of an allegedly incomplete mitigation presentation, and not a deficient jury argument. But, the opinion is instructive as to how this Court should address the question of prejudice under *Strickland*. The *Spisak* Court made clear that the prejudice analysis must be viewed in the context of the case; and in this case, the developed penalty-related facts were grim indeed.

Prior to his resentencing, Lesko was convicted of two other murders committed the same week as this murder.[19] These circumstances were unique and distinguished Lesko from the majority of other first-degree murderers. These murders provided the bases for the jury's finding of the (d)(9) (significant history of violent felony convictions) and (d)(10) (multiple murder) aggravators. As if this unique criminal history was not weighty enough, in this case, Lesko was convicted for his participation in the first-degree murder of an unsuspecting on-duty policeman who did nothing more than pull over the car in which Lesko was driving. This fact provided the jury with a third, powerful aggravating circumstance—that the victim was a police officer killed in the performance of his duties, 42 Pa.C.S. § 9711(d)(1).

Furthermore, based on counsel's presentation, the jury had found that Lesko was under the influence of extreme mental or emotional disturbance, § 9711(e)(2), and it is entirely specu-

19. Although appellant was involved in three murders prior to the murder of Officer Miller, at the resentencing here, the jury was permitted to consider the evidence related to only two of the murders for purposes of determining aggravating circumstances. This restriction was a product of the grant of federal *habeas* relief. *See, supra,* Section I (discussing federal district court's ruling on Indiana County guilty plea).

lative how much more weight the testimony of a neuropsychologist such as Dr. Crown would have lent to this mitigator already found. Of course, it is possible that opinion testimony on brain damage from a neuropsychologist might persuade a juror that Lesko was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law under Section 9711(e)(3). But, Lesko must also show that there is a reasonable probability that, in the overall evaluation, at least one jury member would have concluded that the mitigating circumstances outweighed the aggravating circumstances.

Faced with the aggravating circumstances where the defendant has been found guilty of multiple murders occurring within a one-week period, including the cold-blooded murder of an on-duty police officer, and the case in mitigation already successfully presented, we simply cannot conclude that *Strickland* relief can be premised upon the additional mitigation evidence the PCRA court found would have carried the day.[20] The PCRA court failed to consider the full context of the case in rendering its finding as to *Strickland* prejudice. We do not believe there is a reasonable probability that further expert opinion evidence, including evidence of Lesko's "organic brain damage" would have resulted in a different weighing and different penalty verdict when the aggravating circumstances were so patently grave, and the jury already found substantial mitigating factors, only to return with a verdict of death. This was not an instance where the sentence of death was "only weakly supported by the record." Instead, it was a situation where the sentence was imposed with "overwhelming record support." *See Strickland, supra.* Accordingly, Lesko has not proven that the outcome of the proceedings would have differed, but for counsel's supposed failure.

The other mitigating evidence basis cited by the PCRA court, even when considered in tandem with the evidence of

---

**20.** We note that the PCRA court did not preside over the resentencing trial, and thus, is no better positioned than this Court to assess the effect the evidence at the PCRA hearing would have had on the resentencing jury.

organic brain damage, likewise fails to provide a basis for *Strickland* relief. At the PCRA hearing, Lesko proffered the evidence contained in the CYS records and argued that counsel should have presented a number of live witnesses to relate that evidence. This information included details regarding the deplorable housing conditions in which Lesko and his siblings lived as children, and also detailed abuse and neglect at the hand of their mother. This abuse and neglect led to Lesko and his brother being placed in a shelter and later at the Holy Family Institute. At the PCRA hearing, Lesko offered samplings of this live testimony, producing witnesses that he alleges resentencing counsel should have presented.

A similar argument was recently rejected by the U.S. Supreme Court in its per curiam order in *Bobby v. Van Hook*, —— U.S. ——, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009). The petitioner in *Bobby*, like Lesko, alleged that there was additional mitigating evidence that trial counsel should have uncovered. Specifically, the petitioner alleged that trial counsel should have interviewed other family members as well as a psychiatrist who treated his mother, all of whom could have "have helped his counsel narrate the true story of [the petitioner's] childhood experiences." In rejecting the claim, the Court returned to the standard announced in *Strickland*, explaining:

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained. It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

*Bobby*, 130 S.Ct. at 19 (citations omitted). Like the High Court in *Bobby*, we find that Lesko cannot establish that counsel's performance was unreasonable.

Again, however, even if it is assumed that counsel's performance fell below the *Strickland* threshold, any assessment

of prejudice must recognize that much of this childhood information was already admitted through the testimony of Ms. Nardone, discussed previously. Indeed, the jury found that evidence of Lesko's "horrible" childhood was a mitigating factor. Notably, under similar circumstances, the *Strickland* court did not find prejudice where the "proposed evidence would barely have altered the sentencing profile presented to the sentencing judge." *Strickland*, 466 U.S. at 699–700, 104 S.Ct. 2052. In our judgment, there is not a reasonable probability that a life sentence would have been returned if only the mitigation evidence presented at trial had been supplemented by the mitigation evidence presented at the PCRA hearing, particularly given the strength of the aggravating circumstances detailed above. Accordingly, we conclude that the PCRA court erred in granting a new penalty hearing.

We now turn to the remaining penalty phase contentions Lesko raises on cross-appeal, which the PCRA court dismissed after considering them in its opinion.

### D. Failure to "Fully Litigate" Claim that Prosecutor Improperly Commented on Lesko's Silence

The first alternative issue on which Lesko claims penalty phase relief is due relates to the prosecutor's cross-examination of Lesko at the resentencing and the prosecutor's closing arguments related to the same testimony. Lesko contends that the prosecutor's cross-examination and comments violated his Fifth Amendment right to remain silent and prejudicially undercut the testimony given by both Lesko and Dr. Levit at the resentencing. According to Lesko, the Third Circuit granted him a new sentencing hearing on a similar claim implicating his right to remain silent. Additionally, at the resentencing "the prosecutor flouted [the Third Circuit's] ruling, improperly commenting on and questioning [Lesko] about his right to remain silent, employing in this violation testimony from the 1981 proceedings that had been reversed [sic] on these very grounds." Brief of Appellant Lesko at 33. Lesko acknowledges that counsel objected to the cross-examination and moved for a mistrial and also recognizes that counsel

renewed the claim on direct appeal, but asserts that counsel had no strategic basis for "not fully litigating this claim" by failing to explain the "substantial prejudice" resulting from the prosecutor's improper comment on his right to remain silent. *Id.* at 36.

Before turning to the legal issue presented, some background is in order. Lesko did not testify at the guilt phase of his 1981 trial, but did testify at the penalty phase, limiting his testimony to matters concerning his personal background. During his *habeas* proceedings, Lesko forwarded a claim that the prosecutor's penalty phase closing argument violated the Fifth Amendment when he commented on Lesko's mitigating evidence as follows:

> Good character and record. All of the character witnesses limited their testimony to a certain period of time. We heard about John Lesko up to a certain point.

> And I want you to consider that. John Lesko took the witness stand, and you've got to consider his arrogance. He told you how rough it was, how he lived in hell, and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry.

*Lesko v. Lehman,* 925 F.2d at 1540. Lesko argued to the Third Circuit that the prosecutor's statement about his failure to express remorse violated his Fifth Amendment privilege against self incrimination.

The Third Circuit agreed. The Third Circuit rejected the Commonwealth's assertion that the prosecutor's statements were an appropriate comment on Lesko's demeanor at trial, after examining the substance of Lesko's testimony. The federal court explained that Lesko had testified only to his deprived childhood and family background, but did not testify concerning the merits of the charges against him. According to the court, the "natural and necessary interpretation" of the prosecutor's comments was that Lesko had a moral and legal obligation to address the charges against him and apologize for the crime. Thus, the comments amounted to a condemna-

tion of Lesko's failure to testify about his role in the events surrounding the murder; yet, such testimony could have been self-incriminating. Therefore, the Third Circuit determined that the comments violated due process as they penalized Lesko's Fifth Amendment privilege against self-incrimination. *Lesko v. Lehman,* 925 F.2d at 1544–45.

Lesko uses the Third Circuit's analysis as a springboard for his instant claim, urging this Court to view the circumstances at the resentencing in the same manner as the circumstances discussed above. But the circumstances at the resentencing were very different. Lesko testified at the resentencing hearing, claiming that he was under the influence of drugs and alcohol at the time of the murder. Dr. Levit indirectly corroborated this testimony with his opinion that Lesko was a polysubstance abuser during the relevant period. On cross-examination of Lesko, the prosecutor attempted to undermine Lesko's credibility by pointing out that, at the 1981 penalty phase hearing, Lesko had testified but had said nothing about being under the influence of alcohol or drugs at the time Travaglia and he murdered Officer Miller.[21] Trial counsel initially objected when the prosecutor pursued this impeachment, but was overruled by the trial court, and counsel failed to renew the objection when the prosecutor continued this line of questioning. The prosecutor returned to this subject during his closing argument when he asserted that it was telling that Lesko had not testified to his drug and alcohol abuse during the 1981 sentencing proceeding, by stating:

**21.** The specific line of questioning was as follows:
> Q: You were also called as a witness in your previous trial; isn't that correct?
> A: During the sentencing phase, sir. Yes, sir.
> Q: Did you think at that point it might be important to tell that jury that you were intoxicated and under the influence of drugs back between December 27th and January 3rd?

N.T., 2/16/1995, at 68. Thereafter, defense counsel objected, the trial court overruled the objection, and the prosecutor continued the line of questioning, asking Lesko why he "said nothing about being under the influence of alcohol at the time of the Miller killing...." *Id.* at 73. In response, Lesko confirmed that he said nothing along those lines during the prior penalty phase hearing.

Don't you think that would be important when you committed these homicides ... to tell the jury that I was drunk, that I had drugs and didn't know what I was doing, don't you think that would be something you would remember? ... After 15 years, he's remembered that detail. He remembers all of his drug and alcohol abuse ... but in 1981, he didn't mention a word to the jury about that, a word. What other defense is there? He forgot this defense.

N.T., 2/16/1995, at 173. Trial counsel objected and moved for a mistrial after the prosecutor completed the closing argument, but the motion for a mistrial was denied.

According to Lesko, the error at the resentencing was the same error on which the Third Circuit granted conditional penalty phase relief, since the prosecutor again improperly commented on his right to remain silent at his 1981 trial when the prosecutor asked him about his failure to testify as to his drug and alcohol use at those proceedings.

The PCRA court concluded that this issue was previously litigated on direct appeal when Lesko presented the argument that the prosecutor's closing argument amounted to an impermissible comment on his right to remain silent. 719 A.2d at 221–222. Lesko, however, has presented this collateral claim in terms of ineffective assistance of direct appeal counsel, which requires a more precise examination. *See Collins, supra.*

Nevertheless, Lesko has failed to demonstrate that direct appeal counsel's performance concerning this issue was deficient for the same reasons the Fifth Amendment claim was rejected on direct appeal. Namely, on direct appeal following resentencing, this Court properly focused on the fact that the circumstances addressed by the Third Circuit and those raised at resentencing were distinct. This Court noted that Lesko's testimony on his supposed voluntary intoxication was offered to establish a mitigating circumstance. *See Lesko,* 719 A.2d at 222. Furthermore, we specifically acknowledged that the Third Circuit had granted Lesko conditional penalty phase relief from his first sentence of death premised on a perceived

due process violation due to the prosecutor's comment on silence as to remorse. Nonetheless, we pointed out that the Third Circuit's relief was based on the limited nature of Lesko's penalty phase testimony at the 1981 trial, during which he did not discuss the nature of the charges against him. At the resentencing, however, the prosecutor's cross-examination and commentary addressed only the credibility of the testimony that Lesko actually provided at that proceeding; and the Third Circuit itself had specifically noted that Lesko could not "claim a Fifth Amendment privilege against cross-examination or prosecutorial comment on matters reasonably related to his credibility or the subject matter of his testimony." *Lesko,* 719 A.2d at 222 (*quoting Lesko v. Lehman,* 925 F.2d at 1542). Thus, we held that the Commonwealth's cross-examination and closing argument were proper because they were directed at testing the veracity of the testimony that Lesko had actually presented respecting his voluntary intoxication. *Id.*

■ Having failed in his direct appeal challenge to the prosecutor's impeachment, Lesko now forwards a derivative ineffectiveness claim based upon the very same circumstances. Lesko faults counsel for failing to object on the ground that the prosecutor's questioning and comments improperly undermined the credibility of Lesko and his expert, Dr. Levit. This derivative argument, although sounding in the Sixth Amendment, adds nothing to the substance of the underlying Fifth Amendment claim that was addressed and rejected on the merits on the resentencing direct appeal. Lesko does not aver that this Court's reasoning on direct appeal was flawed or that counsel did not set forth the correct legal argument in support of his Fifth Amendment claim. Indeed, Lesko does not acknowledge or address this Court's reasoning on the resentencing appeal. Instead, he simply declares, without explanation, that counsel did not fully develop the "substantial prejudice" resulting from the prosecutor's comments, without even accounting for counsel's argument.

■ The current focus of Lesko's claim does not establish arguable merit for a claim of ineffectiveness deriving from an underlying claim previously rejected on the merits. The fact remains that Lesko opened the door to the voluntary intoxication impeachment at resentencing, and there is nothing improper in a party attempting to undermine the credibility of testimony through impeachment by noting a failure to forward a claim or defense during prior testimony on the same subject. *Cf. Harrison v. U.S.*, 392 U.S. 219, 222, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968) ("A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives . . . ."). Furthermore, the fact that properly admitted evidence is "prejudicial" is no basis for its exclusion. Accordingly, Lesko has not demonstrated that counsel was ineffective in failing to "fully" argue this issue on direct appeal.

## E. Failure to Object to Commentary on Lack of Remorse

Lesko next argues that the prosecutor objectionably elicited evidence of, and then commented on, his lack of remorse at the time of arrest and that trial counsel was ineffective for failing to properly preserve an objection and pursue the issue on direct appeal. This argument involves Commonwealth witness Detective Frank Amity, who testified at the resentencing that Lesko gave police a statement after his arrest for the murder of Peter Levato, and after he had been given *Miranda* warnings. After Detective Amity read Lesko's statement into the record, the prosecutor asked the detective what Lesko's "demeanor" was at the time of this interview. Detective Amity responded, "I couldn't see where he had any remorse over what he did." N.T., 2/10/1995, at 62. Trial counsel objected, and the trial court sustained the objection and instructed the jury "to disregard the statement." *Id.* at 62–63. The prosecutor then cautioned the detective not to offer a conclusion, and rephrased his question, not in terms of demeanor, but in terms of what Lesko expressed during the interview: "[w]as there any remorse expressed by him at this

interview?" Detective Amity responded, "no." *Id.* at 63. This time, counsel did not object. Thereafter, however, counsel requested a mistrial, asserting that the prosecutor "snuck in" the testimony of absence of remorse. The prosecutor responded he did not "prompt Detective Amity in any way in terms of telling him to say there was no remorse" and also stated that it was not prejudicial because the issue was made relevant by the defense argument that Lesko had shown remorse. The trial court denied the motion for a mistrial. The prosecutor referred to the exchange in closing, asserting that Lesko's "attitude" had not changed while he was in prison.

According to Lesko, this line of inquiry and comment improperly introduced a non-statutory aggravating circumstance (absence of remorse) for the jury's consideration. Lesko avers that counsel's failure to object to the second exchange was "inexplicable" and then he declares that counsel could have had no reasonable strategy for failing to object and for failing to pursue the claim on appeal.

The Commonwealth responds that the evidence and commentary it produced on Lesko's lack of remorse was a fair and proper response to the defense penalty phase opening, and Lesko's subsequent testimony, that Lesko felt remorse for his crimes.[22] The PCRA court likewise concluded that the underlying issue was without merit because Lesko had put his remorse at issue.

In a brief, final paragraph of his argument Lesko responds that the PCRA court erred in holding that he opened the door to rebuttal evidence on remorse because it was "simply impermissible" for the Commonwealth to rebut his remorse mitiga-

22. Lesko generally testified about what he had learned since being in prison and being exposed to religious beliefs and literature. Defense counsel then asked, "how do you feel about these crimes for which you have been convicted," and the following occurred:

A: I feel bad about them, sir.

Q: How is that?

A: I'm sorry that I did them. I'm sorry that I got involved in them. I wish it was humanly possible that I could change that, but I can see no way I can do that, sir.

N.T., 2/16/1995, at 66–67.

tion evidence with evidence concerning his silence at the time of his arrest. Brief of Appellant Lesko, at 38–39. In support of this argument, Lesko cites to *Cooper v. Oklahoma*, 517 U.S. 348, 354, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), for the boilerplate proposition that the right to remain silent "without penalty for doing so" is a fundamental trial right.

Lesko's primary underlying argument, *i.e.*, that rebuttal evidence about his lack of remorse violated his constitutional rights by introducing a non-statutory aggravating circumstance, is meritless. In general, the credibility of a witness may be impeached by any evidence relevant to the issue, except as provided by statute or rule. *See* Pa.R.E. 607(b). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact ... more probable or less probable...." Pa.R.E. 401. Moreover, the U.S. Supreme Court has indicated that a defendant cannot claim a Fifth Amendment privilege against cross-examination or prosecutorial comment on matters reasonably related to his credibility or the subject matter of his testimony. *See Jenkins v. Anderson*, 447 U.S. 231, 235–36, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980); *Harrison, supra.*

In this case, Lesko produced affirmative evidence of his remorse as a mitigating circumstance, and counsel argued the point in both opening and closing to the jury. The Commonwealth obviously was entitled to challenge the sincerity of the late expression, no less than it was entitled to rebut his testimony of voluntary intoxication by noting the failure to forward that claim when he testified at the first sentencing proceeding. *See Lesko*, 719 A.2d at 222. Rebuttal of mitigation evidence does not introduce a non-statutory, additional aggravating circumstance; hence, Lesko's claim of counsel ineffectiveness fails.

Of course, the question of whether the particular manner of rebuttal here was proper, a point which Lesko adds in the final paragraph of his argument, is different and distinct. As noted, Lesko argues that rebutting his claim of remorse with evidence of his failure to express remorse at the

time of his arrest was improper because admitting such evidence is "simply impermissible."[23] Lesko does not develop this absolutist argument any further, and it was not addressed by the Commonwealth or the PCRA court.

The PCRA court's failure to address this sub-argument no doubt resulted from the confusing and prolix nature of Lesko's filings below. Lesko did not raise this sub-issue in his initial PCRA petition; instead, his complaint tracked his primary theory that the Commonwealth injected an improper aggravating circumstance by rebutting his expression of remorse. In his second supplement to the petition, Lesko did include a one-paragraph argument stating that comments on a defendant's failure to express remorse violate the Fifth Amendment. Notably for present purposes, however, Lesko did not specifically tie the argument to the right to remain silent at the time of arrest, as he does now. Rather, Lesko simply declared that, "had [he] expressed remorse for the killing, the Commonwealth would have presented that as evidence of guilt at trial. Eliciting the absence of such a confession violates the Fifth Amendment and Article 1, Section 9 (a defendant 'cannot be compelled to give evidence against himself') as much at the guilt-stage as it does at sentence." Second Supplement at 32–33, ¶ 610. Lesko then appended a general ineffectiveness paragraph to the entire claim two paragraphs later. It is not clear that the one-paragraph theory appended to Lesko's primary argument on appeal is the same as the one belatedly identified below; hence, the claim arguably is waived. *See* Pa.R.A.P. 302.

In any event, whether waived or not, the claim does not warrant a grant of relief. The U.S. Supreme Court has held that a defendant's silence following *Miranda* warnings is "insolubly ambiguous" and thus cannot be used at trial for

23. We emphasize the narrowness of Lesko's current underlying argument. Lesko does not argue that his failure to express remorse when interviewed after his arrest for the murder of Levato was not relevant proof that he actually lacked remorse for his crimes, or that failure to volunteer remorse does not fairly raise an inference of lack of remorse. Rather, his claim is confined to a broad argument that no reference can be made to silence at the time of arrest.

impeachment purposes. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). However, the High Court has also explained that if the defendant waives his right to be silent and talks to the police, as Lesko did here, then *Doyle's* prohibition does not apply to cross-examination that inquires into the prior statements. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson v. Charles*, 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (per curiam) (1980). The Court has not clarified whether the Fifth Amendment prohibits using a defendant's failure to volunteer his remorse as a basis upon which to infer a lack of remorse. *See, e.g., Mitchell v. United States*, 526 U.S. 314, 330, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) ("Whether silence bears upon the determination of a lack of remorse, or upon acceptance of responsibility for purposes of the downward adjustment provided in § 3E1.1 of the United States Sentencing Guidelines (1998), is a separate question. It is not before us, and we express no view on it."). Lesko's absolutist argument fails to address these complexities.

The Fourth Circuit recently discussed the remorse question in *United States v. Caro*, 597 F.3d 608, 629 (4th Cir.2010), pointing out that there was a split of authority among the federal courts as to whether the Fifth Amendment prohibits using silence to show lack of remorse. Notably, the *Caro* court cited the Third Circuit *Lesko* decision as an example of a case opining that a defendant's failure to apologize, *i.e.,* his silence as to remorse may not be considered as lack of remorse, consistently with the Fifth Amendment. But, the *Caro* court also noted that other circuits had concluded that silence may be considered as indicating a lack of remorse without violating the Fifth Amendment because lack of remorse speaks to other penological interests, such as a failure to accept responsibility for the crime, rehabilitation and deterrence. Thus, at the very least, the Fifth Amendment basis for

objection posed by Lesko is not so easily determined as he would have it.

Further complicating any assessment of trial counsel's stewardship in failing to forward a Fifth Amendment-based objection to the reference to Lesko's failure to volunteer remorse when he spoke to the police is the state of the law in Pennsylvania at the time of resentencing. At that point, this Court had repeatedly held that a defendant's right against self-incrimination had no application in the penalty phase of a capital trial. *See, e.g., Commonwealth v. Edmiston,* 535 Pa. 210, 634 A.2d 1078 (1993); *Commonwealth v. Travaglia,* 502 Pa. 474, 467 A.2d 288 (1983). Indeed, we continued to follow this principle until *Commonwealth v. Freeman,* 573 Pa. 532, 827 A.2d 385 (2003), when we recognized that the U.S. Supreme Court had ruled in 1981 that the Fifth Amendment privilege in fact applies to the penalty phase of capital trials:

Notwithstanding the line of authority from this Court relied upon by the Commonwealth, it appears that the United States Supreme Court—the ultimate authority on Fifth Amendment questions—has indicated that the constitutional privilege does apply to the penalty phase of capital trials. *See Estelle v. Smith,* 451 U.S. 454, 462–63, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) ("We can discern no basis to distinguish between the guilt and penalty phases of [a] capital murder trial so far as the protection of the Fifth Amendment privilege is concerned."); *see also Mitchell v. United States,* 526 U.S. 314, 325, 119 S.Ct. 1307, 143 L.Ed.2d 424 (1999) ("Where a sentence has yet to be imposed ... this Court has already rejected the proposition that 'incrimination is complete once guilt has been adjudicated' ") (quoting *Estelle,* 451 U.S. at 462, 101 S.Ct. 1866, 68 L.Ed.2d 359).

827 A.2d at 410. In posing his absolutist Fifth Amendment theory, and then claiming counsel was ineffective for not pursuing that theory, Lesko does not account for the complicating factor of the extant precedent of this Court in 1995.

Consistently with *Strickland,* this Court has been wary of holding counsel ineffective for failing to object when the

governing law was unsettled. *See, e.g., Commonwealth v. Fletcher*, 604 Pa. 493, 986 A.2d 759, 801 (2009) (counsel not ineffective when his conduct was predicated on established law or when he failed to predict change in law). On the other hand, *Estelle* was the controlling U.S. Supreme Court authority on the question of the applicability of the Fifth Amendment privilege at capital penalty proceedings, and it was in existence at the time of resentencing. Of equal relevance, counsel had available to him the federal *habeas* opinion in this very case that he argued in the Third Circuit, where the court had parted ways with this Court's conclusion that Fifth Amendment violations were not cognizable in penalty phase proceedings, citing to *Estelle*. Moreover, although federal law was not clear then (nor is it now) respecting whether the Fifth Amendment prohibits the type of impeachment at issue in this case—where Lesko waived his *Miranda* rights and gave a police statement, but where the no remorse inference was being drawn from a failure to volunteer remorse—counsel again had to have been aware of the Third Circuit's holding in the *habeas* appeal in this case. Whether right or wrong, as discussed in our resolution of the prior issue, the Third Circuit held that the Commonwealth's argument at the first penalty phase that Lesko had failed to express remorse when he testified was an improper comment on his right against self-incrimination at trial. The panel viewed the commentary on remorse to be a matter going to the merits of the charges against Lesko, as to which he had a right to remain silent, and concluded that Lesko did not broach that subject merely because he had testified to his abusive childhood and family circumstances as mitigation evidence, while remaining silent concerning remorse.

Under these circumstances, and solely for purposes of decision, we will assume that counsel could have forwarded a Fifth Amendment-based objection to the form of the Commonwealth's manner of rebutting Lesko's expression of remorse, and we will assume further that such an objection might have been sustained because of the Third Circuit's conclusion in the *habeas* proceedings. Lesko's ineffectiveness claim neverthe-

less fails because he has not proven *Strickland* prejudice, *i.e.*, a reasonable probability that the outcome of the resentencing proceeding would have been different but for this rebuttal.

As discussed previously, Lesko himself was permitted to testify as to his changed character and his remorse for his crimes, as a mitigating circumstance.[24] Defense counsel also presented the testimony of Graterford Prison Chaplain Hamid Abdul, who supported Lesko's testimony by testifying as to Lesko's service to others during his incarceration on death row, the fact that he had found faith, and that Lesko was repentant. N.T., 2/14/1995, at 647–657. Lesko's expression of remorse was in the present tense, and was part of a larger claim that he was a changed person after being imprisoned on death row for fifteen years. Defense counsel's closing argument highlighted the theory when he stated, "[w]e know that something has happened in the life of John Lesko in the prison in Graterford. We know that something happened." Counsel argued that there was "something vital happening" in Lesko's life, noting that Chaplain Abdul had testified that Lesko had been affected by his life in prison in a positive manner. N.T., 2/16/1995, 187, 193. Concluding this line of argument, defense counsel stated:

> Do we see any of that in the life of John Lesko before say 1984, 1985? No. We see drugs. We see molestation. We see sex. Wee [sic] see despair. We see hopelessness. We see anger. We see rage, quiet rage, the worst kind of rage, internalized rage, quiet rage, the most deadly rage. Not once in the story presented to you did you hear of John Lesko doing good work and what's happened in that cell in Graterford Prison.... John has helped bring sanity to hell. That's the some [sic] and substance of the Chaplain's words.

*Id.* at 194–95.

Lesko never intimated that he had felt remorse at the time of this murder or his other crimes. But, the prosecutor's rebuttal was backward-looking, as it was limited to Lesko's failure to express remorse at the time of his arrest. The

---

**24.** The Commonwealth does not dispute that Lesko's evidence in this regard was properly relevant mitigation evidence.

Commonwealth's rebuttal did not address Lesko's overarching "I'm a changed man" theme. Notably, and presumably as a result of Lesko's remorse and reformation testimony and the corroborating testimony of Chaplain Abdul, at least one juror found as a mitigating circumstance Lesko's change in character over the last fifteen years of his confinement under the catchall mitigator, 42 Pa.C.S. § 9711(e)(8). Thus, it appears that Detective Amity's statement regarding Lesko's failure to express remorse at arrest was unsuccessful at blunting the point in mitigation that Lesko sought to make. On this record, and particularly in light of the strength of the aggravating circumstances (as we have addressed at length above), we conclude that Lesko has not proven *Strickland* prejudice.

### F. Deficient Cross–Examination of Detective Amity

Lesko's next argument is again directed at the testimony of Detective Amity, but this time he faults trial counsel for failing to adequately cross-examine the detective on his testimony that Lesko had drawn a gun on him when the detectives entered the hotel room to arrest him and his co-defendant. According to Lesko, he told his trial counsel that the detective's account was untrue: in fact, he did not draw a gun. Moreover, Lesko argues that the detective's account is incredible because he believes that, if he had drawn a gun on Detective Amity, the officer surely would have shot him. Lesko also asserts that trial counsel should have cross-examined Detective Amity with two police reports on the same subject, one of which reported that Lesko raised a gun under the sheets while he was in bed and the other of which reported that Lesko stood up and took a gun out of his belt. According to Lesko, these inconsistent details of how he drew his gun would have challenged Detective Amity's credibility concerning whether he drew a gun.

The PCRA court reasoned that Lesko's argument regarding what Detective Amity would have done had he drawn a gun on him relied purely on speculation and was unfounded. Furthermore, the PCRA court pointed out that the two reports cited by Lesko did not help him, since in both versions, Lesko

clearly possessed a gun. Accordingly, the court failed to see how the "slightly different versions of the manner in which [Lesko] produced the gun makes a difference or creates an issue." PCRA Court Opinion, 8/7/2006, at 47.

The PCRA court's opinion on this issue is well-reasoned. Lesko's unsubstantiated belief that criminals never pull guns on police without getting shot is rank speculation, contradicted by common sense and experience. Lesko's alternative argument, concerning the detective's prior statements, ignores the fact that the extant police reports corroborated Detective Amity's central testimony that Lesko possessed a gun at the time of his arrest. Of course, Lesko himself was free to testify and directly contradict the detective, and have the jury decide who was telling the truth. But, the fact that Lesko would dispute the account does not mean that the detective's account was rendered inherently implausible. Additional cross-examination by counsel would have accomplished little, since the reports all supported the core of Detective Amity's testimony. Counsel is not obliged to pursue unpromising avenues of impeachment.

## G. Jury Instructions

Lesko's next argument focuses on the trial court's refusal to instruct the jury regarding the procedural history of the case. Lesko avers that the jury should have been instructed that the resentencing was a result of prosecutorial misconduct. In a series of speculations, Lesko contends that, in the absence of such an explanation, the jury was left to speculate why the resentencing was occurring years after the original trial; the jury could have hypothesized that the resentencing was based on a mere technicality; and, if that happened, arbitrary, capricious, and unreliable factors may have infected the jury's sentencing determination. According to Lesko, the U.S. Supreme Court requires accurate instructions on procedure in order to guarantee constitutional safeguards, citing to *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983). Lesko

acknowledges that counsel requested such an instruction at the resentencing hearing, which the trial court denied, but he argues that trial counsel was ineffective for failing to pursue the preserved issue on direct appeal.

The PCRA court reasoned that Lesko's argument was vague as he had not and could not define what factors the jury supposedly considered by virtue of its ignorance respecting why a new proceeding was ordered. Furthermore, the PCRA court pointed out that the focus of the resentencing hearing was to determine the existence of aggravating and mitigating circumstances and, if it came to it, to consider whether the aggravating circumstances outweighed the mitigating circumstances. Thus, in the PCRA court's opinion, the reason for the resentencing was of no moment for the jury. The PCRA court is correct.

The U.S. Supreme Court cases relied on by Lesko lend no support to his position. In *Ramos,* the Court held that a jury instruction that informed the jury that a life sentence could be commuted was not constitutionally infirm because, once the proceedings reach the penalty phase, "the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment. In this sense, the jury's choice between life and death must be individualized. 'But the Constitution does not require the jury to ignore other possible ... factors in the process of selecting ... those defendants who will actually be sentenced to death.' " *Ramos,* 463 U.S. at 1008, 103 S.Ct. 3446 (citation omitted).

Following on the heels of *Ramos,* in *Caldwell,* the state of Mississippi asserted that a prosecutor's comments that downplayed the jury's responsibility for its capital sentencing decision by calling its attention to the appellate review process did not violate the U.S. Constitution because *Ramos* made clear that each state must determine the extent to which a jury should be informed of post-sentencing procedures. The U.S. Supreme Court was not persuaded by Mississippi's argument, because the prosecutor's comments were not relevant to the jury's sentencing decision. Instead, in the Court's opinion, the prosecutor's statements improperly urged the jury to view its

decision as only a preliminary step in the sentencing process, thereby creating in the minds of the jury a belief that it was not ultimately responsible for the sentence imposed. "Creating this image in the minds of the capital sentencers is not a valid state goal, and *Ramos* is not to the contrary. Indeed, *Ramos* itself never questioned the indispensability of sentencers who 'appreciat[e] ... the gravity of their choice and ... the moral responsibility reposed in them as sentencers.'" *Caldwell*, 472 U.S. at 336, 105 S.Ct. 2633 (citation omitted).

As a question of appellate counsel ineffectiveness, Lesko's claim is a non-starter. Lesko cites no case or other authority that counsel could have invoked on direct appeal in support of a claim that the jury was required to be informed of the reason for the resentencing. Counsel's task on appeal would have been to show error in the trial court's discretionary ruling on his novel request; counsel had no relevant ammunition to pursue that argument.

Moreover, Lesko's current formulation of what the jury should have been told, as the reason for resentencing, is inaccurate and argumentative. As discussed previously, and contrary to Lesko's argument, the Third Circuit panel's opinion that constitutional error occurred in the initial sentencing proceeding did not establish that "prosecutorial misconduct" required a new trial. Instead, the panel concluded that the prosecutor made "improper comments" that infected the trial with unfairness, rendering the sentence proceeding tainted by a denial of due process. *See* 925 F.2d at 1546. That opinion is no ground to gratuitously tell the jury that the Commonwealth committed "misconduct." Moreover, even if the Third Circuit had found prosecutorial misconduct, such a finding would not represent some objectively accurate assessment of the proceedings: at most, it would represent the view of the federal panel which, in point of fact, was not the view shared by the Pennsylvania judges, including this Court, who reviewed the same sentencing proceeding. *See Lesko*, 467 A.2d at 300–01. A full and accurate explanation of the mechanics of that reality would be far more complex than Lesko poses, implicating the vagaries and uncertainties of a non-deferential *habeas corpus*

review system that no longer exists. And, for purposes of completeness, explaining the reason for the resentencing presumably would require informing the jury that Lesko was denied relief in state court, which might very well suggest to the jury that the federally-ordered resentencing was indeed the product of a "technicality."

Equally fundamentally, even if it assumed that an easy, fair and accurate description of the operation of the grant of federal *habeas* relief were possible, we agree with the PCRA court that here, as in *Caldwell,* the topic was irrelevant to the resentencing jury's task, which involved passing upon aggravating and mitigating circumstances and weighing them. As the PCRA court aptly observed, the purpose of the procedures set forth in Section 9711 are directed at establishing whether the jury shall fix the sentence at death or life in prison. The jury's knowledge of the reason for the resentencing would not further this goal. Accordingly, Lesko has not established that appellate counsel's performance was deficient for failing to purse this issue.

Lesko next challenges the trial court's instruction regarding the credibility of witnesses which, Lesko alleges, improperly singled him out. The resentencing court issued general instructions regarding witness credibility, which included, *inter alia,* an instruction to consider whether the witness had an interest in the outcome of the case and whether the witness had some friendship with or animosity towards the accused. Thereafter, the trial court issued additional, specific instructions. First, the court noted the testimony of Michael Lesko, Lesko's brother, who was offered as a character witness, but who had been convicted of the prior crimes of robbery and burglary; the court then stated that "[t]he only purpose for which you may consider this evidence of a prior conviction is in deciding whether or not to believe all or part of [his] testimony...." N.T., 2/17/1995, at 18. Next, the court noted the testimony of Richard Rutherford and, given evidence of his possible participation and interest here, issued a corrupt source charge. *See id.* at 19.

The court then turned to Lesko's testimony, adverting to its general charge by first stating that in "considering the defendant's testimony, you are to follow the general instructions I have given you for judging the credibility of any witness." The court followed this statement with the following instruction, which forms the basis for the instant ineffectiveness challenge:

You should not disbelieve [Lesko's] testimony merely because he is the defendant. In weighing his testimony, however, you may consider the fact that he has a vital interest in the outcome of the case and you may take [Lesko's] interest into account along with all other facts and circumstances bearing on credibility in deciding what weight his testimony deserves.

*Id.* at 19–20.

Lesko acknowledges that this instruction directed the jury not to simply disbelieve Lesko because he was the defendant, but he complains that it allowed the jury to consider his testimony "suspect, in violation of the Fifth and Fourteenth Amendments." Brief of Appellant Lesko, at 43. Furthermore, Lesko points to the non-binding 1980 Pennsylvania Suggested Standard Jury Instructions recommending language that the defendant's interest should be considered "just like the interests of any other witness," and argues that the trial court should have included this language when instructing the jury. Lesko also avers that many of the witnesses had an interest in the outcome of the proceedings and it was unfair to single his testimony out; he then speculates that the court's charge could have caused the jury to view his testimony as particularly "suspect." Lesko argues that trial counsel was ineffective for failing to object to the instruction on this ground and failing to raise the issue on direct appeal.

The PCRA court considered the challenged instruction as a whole and concluded that it was not inflammatory or accusatory. Rather, "the charge cautioned the jury that it should not disbelieve [Lesko] simply because he was the accused." PCRA Court Opinion, 8/7/2006, at 64. Accordingly, the court determined that there was no error in the charge and found

Lesko's derivative ineffectiveness argument to be without merit. We agree.

It is well settled that in reviewing a challenge to a jury instruction the charge, as a whole, must be considered. Furthermore, the trial court has broad discretion in phrasing the instructions, so long as the directions given "clearly, adequately, and accurately" reflect the law. *See Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1142 (2008).

Viewing the instruction as a whole, the absence of language such as "just like the interests of any other witness" did not unfairly single out Lesko's testimony, or suggest that it was "suspect." In fact, the introductory sentence to the challenged charge clearly, adequately, and accurately instructed the jury that it was to apply the general credibility instructions to Lesko's testimony just as it would to any other witness. Moreover, contrary to the assertions of Lesko, the charge did not tell the jury to consider his testimony to be "suspect;" it just told the jury that it could "consider" his obvious interest in the outcome in weighing his testimony. This is a benign charge. Furthermore, Lesko's testimony was not the only testimony that was "singled out" for additional comment by the trial court. Instructions to the jury are to be fair and accurate; they are not required to embody points that a party more properly should make in argument. Accordingly, we agree with the PCRA court that this claim of counsel ineffectiveness lacks arguable merit.

## H. Trial Court's Discretionary Rulings

Lesko's next claim relates to the trial court's refusal to permit him to introduce evidence that co-defendant Travaglia had also received a sentence of death for the murder of Officer Miller. Lesko contends that such information would have been invaluable, since the evidence showed that he was not the triggerman, the Commonwealth prosecuted him on an accomplice liability theory, and his trial counsel argued to the jury that he was a minor participant in the crime. According to Lesko, the law requires that capital sentencing juries be given

all information relative to a defendant's mitigating circumstances and sentences received by more culpable criminal confederates, in his view, may prove a mitigating circumstance. Lesko cites *Parker v. Dugger*, 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), in support of his claim, arguing that *Parker* stands for the proposition that sentences received by more culpable confederates are relevant in determining whether the defendant's lesser participation in the crime warrants a sentence other than death.

In his PCRA petition, Lesko posed this claim as one sounding in counsel ineffectiveness, albeit he devoted the bulk of his pleading to explaining why he believed the trial court "erred" in refusing to admit such evidence, and then merely appended a one-sentence allegation as to prior counsel's ineffectiveness. (The argument in the petition was typical of the manner in which Lesko has presented his ineffectiveness claims.) Lesko's complaint as presented in his appellate brief, however, alleges only trial court error. Any claim of trial court error is obviously waived, as Lesko could have raised it at trial and on direct appeal, but he did not.

The PCRA court evaluated the underlying, defaulted claim and deemed it to lack merit, without speaking specifically to the cognizable claim of counsel ineffectiveness.[25] The court reasoned that Lesko and his co-defendant were sentenced by different juries and each jury was to assess the individual mitigating and aggravating circumstances as they related to each participant. The task for Lesko's jury was to weigh the circumstances as they related to Lesko; his co-defendant's penalty was irrelevant to that consideration. Furthermore, the PCRA court explained that Lesko's challenge failed as it was simply a dressed-up challenge to the proportionality of his sentence. The Commonwealth echoes the PCRA court's anal-

25. The claim of ineffectiveness could only sound in direct appeal counsel's failure to forward the issue on appeal from the resentencing, as trial counsel asked that the evidence of Travaglia's death sentence be admitted at trial, but the Commonwealth objected. The trial court sustained the Commonwealth's objection. N.T., 2/16/1995, at 21.

ysis, and likewise does not address the overarching, cognizable claim of counsel ineffectiveness.

As noted, Lesko poses his claim solely as a claim of trial court error, and has not argued a derivative claim of ineffectiveness on this appeal, even though he couched the claim in terms of prior counsel ineffectiveness below. The PCRA provides that a claim is waived when it could have been raised before trial, at trial, or on appeal. 42 Pa.C.S. § 9544(b). As Lesko's current and exclusive claim of trial court error could have been raised on direct appeal and as it is no longer raised in terms of prior counsel's ineffectiveness, it is waived.

■■■ Even presuming that the claim was not waived, we agree with the PCRA court that Lesko's underlying claim lacks merit.

This Court has had the opportunity to consider this same question on prior occasions, in arguably more compelling circumstances, *i.e.*, in circumstances where co-defendants received lesser sentences. In *Commonwealth v. Haag,* 522 Pa. 388, 562 A.2d 289 (1989), the appellant argued that his death sentence was arbitrary and capricious in light of the fact that the other participants in the crime did not receive death sentences. The appellant also contended that the trial court erred in refusing to apprise the jury of these lesser sentences. In resolving these questions, we explained that sentencing is a highly individualized matter and the aggravating and mitigating circumstances applicable to any one defendant are variable as well. *Id.* at 299. We also clarified that the disposition of the matters against the accomplices had no bearing on the appellant's sentence. *Id.* at 298. Accordingly, we rejected the appellant's argument. *Id.; see also Commonwealth v. Williams,* 586 Pa. 553, 896 A.2d 523, 547 (2006); *Commonwealth v. Lopez,* 578 Pa. 545, 854 A.2d 465, 471 (2004).

■■■ Lesko's theory is nearly identical to the one pursued by Haag and rejected by this Court. While evidence that a capital defendant played a lesser role in the murder than a confederate may be relevant evidence in mitigation, the sentence received by a criminal confederate is not, especially

given the individualized nature of sentencing. The sentences received by confederates are not probative of specific statutory mitigators, nor are they relevant evidence respecting the defendant's character or record or the circumstances of the offense itself, which states must permit. *See Skipper v. South Carolina,* 476 U.S. 1, 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (capital sentencer cannot be precluded from considering, as mitigating factor, aspects of defendant's character or record and circumstances of offense proffered as basis for sentence less than death); 42 Pa.C.S. § 9711(e) (outlining statutory mitigators, including character/record/circumstances catchall mitigator at subsection (e)(8), which "obviously mirrors the requirements of *Skipper.*" *Commonwealth v. Harris,* 572 Pa. 489, 817 A.2d 1033, 1054 (2002)). Lesko fails to acknowledge this governing authority much less does he attempt to distinguish it.

Moreover, the decision in *Parker* has no application here. *Parker* involved the High Court's review of the process the Florida state courts followed in imposing · and reviewing a sentence of death under the Florida statutory scheme. Lesko does not raise a similar challenge here.

Specifically, in *Parker,* the U.S. Supreme Court reiterated that the Fourteenth Amendment of the U.S. Constitution prohibits the arbitrary or irrational imposition of a sentence of death. In that case, the High Court was called upon to review the Florida Supreme Court's decision affirming a sentence of death. The broad question presented was whether the sentence of death met federal constitutional requirements. In answering the question, the Court needed to determine the effect the trial court and the Florida appellate court gave to evidence of non-statutory mitigators. The U.S. Supreme Court concluded that before imposing the sentence of death, the trial court must first have considered the non-statutory mitigating evidence[26] including, *inter alia,* the fact that none of

26. This presumption was based on the fact that the jury had recommended a sentence of life in prison. The Court reasoned that the jury could have made such a recommendation only because it found mitigating evidence, including non-statutory mitigating evidence, that out-

the accomplices had received a sentence of death for the murders. The Court then concluded that the Florida Supreme Court also needed to consider the non-statutory mitigating evidence in reviewing the sentence of death. The state appellate court, however, did not do so. Instead, the state court struck two (out of six) aggravating circumstances relied upon by the trial court but neither conducted an independent weighing of the remaining evidence (including consideration of the non-statutory mitigating evidence) nor a harmless error analysis. The U.S. Supreme Court concluded that the state appellate court's approach did not amount to meaningful appellate review of the death sentence, and, therefore, violated the Fourteenth Amendment's prohibition against the arbitrary or irrational imposition of a sentence of death.

Lesko's reliance on *Parker* is misplaced. *Parker* nowhere imposes a constitutional requirement that the sentence received by a co-conspirator be admitted as mitigating evidence. The mere fact that the Florida trial court permitted such evidence to be introduced during the sentencing phase of the proceedings, and that this was part of the factual scenario the U.S. Supreme Court was given, does not elevate it to a constitutional requirement. Rather, *Parker* stands for the proposition that an appellate court cannot ignore such evidence upon appellate review when that evidence is in the record and the appellate task, under the state review system in place, requires consideration of the whole record. In this case, there was no such evidence placed in the record. As stated previously, this Court has repeatedly concluded that evidence of the sentences received by co-defendants is not required to be included at sentencing. Further, the U.S. Supreme Court has not held, or even indicated, to the contrary. Accordingly, even if not waived, Lesko's claim fails.

weighed aggravating evidence. In Florida, the trial court was bound to accept the jury's recommendation unless there were such "clear and convincing" facts to the contrary "that virtually no reasonable person could differ." 498 U.S. at 313, 111 S.Ct. 731. Furthermore, the trial court was required by law to consider any mitigating evidence, which necessarily included the non-statutory mitigating evidence presented to the jury. *Id.* at 314, 111 S.Ct. 731.

Lesko next argues that the trial court erroneously permitted evidence of his prior bad acts to be admitted, and that his trial counsel was ineffective for failing to seek an appropriate limiting instruction and for not pursuing the issue on direct appeal. Lesko points to the specific evidence that was admitted regarding the Levato, Newcomer, and Nicholls murders and contends that such evidence was unnecessary to prove any aggravating circumstances. Lesko also contends that evidence of the robberies that he allegedly committed with his co-defendant should not have been admitted as they were crimes for which he was not convicted. Furthermore, according to Lesko, this evidence, once admitted, should have been accompanied by an appropriate jury instruction to the effect that the evidence was not proffered to show his bad character or criminal propensity, but was only admitted for the limited purpose of establishing the history of the case.

The PCRA court addressed only the admissibility of the evidence, and noted that this claim was previously litigated on direct appeal. Lesko acknowledges that the underlying claim concerning admissibility was litigated on direct appeal, but insists that his current claim is reviewable to the extent it is based on counsel's failure to seek a cautionary instruction, an issue that was not raised or addressed on direct appeal. We will consider the distinct, but limited Sixth Amendment aspect of the claim. *Collins, supra.*

On the direct appeal from his resentencing, Lesko argued that the Commonwealth should not have been permitted to present evidence regarding his prior bad acts, including specific evidence surrounding the nature and circumstances of the other three murders. In rejecting Lesko's claim, this Court held that the nature and circumstances were relevant to the jury's consideration of Lesko's character and record. "The nature of the offense, as ascertained, through examination of the circumstances concomitant to its commission, has much bearing upon the character of a defendant, and indeed, without reference to those facts and circumstances, consideration of 'convictions' would be a hollow process, yielding far less information about a defendant's character than is relevant."

*Lesko,* 719 A.2d at 224–25 (quoting *Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460, 465 (1984)). Thus, we concluded that "since there has been no showing of undue prejudice, this was a relevant and proper factor in the jury's consideration of the sentence which should be imposed." *Lesko,* 719 A.2d at 225.

Recognizing that the question of admissibility and direct review prejudice has already been determined, we pass to the question of whether trial counsel was obliged to request a specific instruction from the trial court regarding the jury's consideration of this same evidence. Of course, there was nothing to prevent trial counsel from requesting a cautionary charge, but Lesko has not established that his trial counsel did not have a reasonable trial strategy for failing to request such an instruction.

The Rules of Appellate Procedure provide that the argument section of the appellate briefs must direct the court's attention to the relevant section of the record necessary to assess a claim. *See* Pa.R.A.P. 2119 and 2132. This is not a case where the PCRA claim was summarily dismissed; rather, there was a hearing below. Lesko does not point to the part of the PCRA hearing record which shows that trial counsel was asked and explained why he did not request a cautionary instruction. Furthermore, while PCRA counsel inquired into this area generally in his examination of prior counsel, our independent review of the record indicates that trial counsel was never asked his reasons for failing to request a cautionary charge; and yet that distinct point is the entire basis for Lesko's current ineffectiveness claim, which is limited in scope given that the admissibility question was already litigated against him. *See* N.T., 12/16/1999, at 433–36. It is well settled that the decision whether to seek a jury instruction implicates a matter of trial strategy. *See Commonwealth v. Hawkins,* 586 Pa. 366, 894 A.2d 716, 730 (2006); *Commonwealth v. Garcia,* 585 Pa. 160, 888 A.2d 633, 638 (2005); *Commonwealth v. Sullivan,* 450 Pa. 273, 299 A.2d 608, 610 (1973). Accordingly, based on the record before us, and because Lesko has not established any ground for deeming

counsel *per se* ineffective, Lesko has not sustained his burden of showing that trial counsel did not have a reasonable trial strategy for failing to request a cautionary instruction. *See, e.g., Commonwealth v. Puksar*, 597 Pa. 240, 951 A.2d 267, 277–78 (2008).[27]

## I. Duplicative Use of Aggravating Circumstances

Lesko next argues that the prosecution's alleged "duplicative" use of the same facts to establish separate aggravating circumstances violated the Eighth Amendment. This is yet another claim where Lesko takes an issue actually litigated at resentencing and on appeal and claims that prior counsel was incompetent for failing to pose the issue properly. The underlying complaint here, as before, focuses on the Commonwealth's reliance on the murders of Peter Levato and Marlene Sue Newcomer to establish the aggravating circumstances enumerated in both Section 9711(d)(9) (significant history of prior felony convictions) and Section 9711(d)(10) (defendant was convicted of another federal or state offense for which a sentence of life imprisonment or death was imposable) of the capital sentencing statute. Lesko acknowledges that trial counsel raised the same complaint at resentencing and on direct appeal, but he asserts that he was ineffective to the extent his argument failed to incorporate a constitutional component. The constitutional angle that Lesko now asserts is that the Eighth Amendment supposedly "does not permit" the jury to consider the same evidence multiple times in the weighing process. As support for his claim concerning what

27. In any event, Lesko has not shown a reasonable probability that the outcome of the sentencing proceeding would have differed if only the charge had been issued. Lesko's one-sentence argument that the jury may have viewed the evidence for a different purpose and considered it as an additional aggravator is purely speculative and unsupported by the record. Indeed, there is nothing to suggest, other than Lesko's bald allegations, that the jury considered aggravating circumstances beyond those found by it and enumerated on the verdict slip. In any event, as discussed previously, there was overwhelming evidence supporting the jury's verdict of death. *See, e.g., Commonwealth v. Cox*, 603 Pa. 223, 983 A.2d 666, 689–90 (2009) (finding no prejudice from counsel's failure to request cautionary instruction where there was overwhelming evidence of guilt).

the Eighth Amendment allegedly prohibits categorically, Lesko cites to no binding authority, but instead cites to a federal capital case arising from Oklahoma the year after his resentencing proceeding, *United States v. McCullah*, 76 F.3d 1087 (10th Cir.1996), involving the distinct federal capital punishment scheme.[28]

The PCRA court concluded that this claim was previously litigated and decided it adversely to Lesko on that ground. Lesko argues that the PCRA court's finding gives insufficient consideration to his current Sixth Amendment claim of ineffectiveness or recognition that the claim raised on direct appeal was a claim of statutory construction, not of constitutional law. Lesko notes that, on direct appeal, counsel asserted only that it was error for the Commonwealth to introduce evidence of three aggravating circumstances arising out of the two murder convictions under the capital sentencing statute, 42 Pa.C.S. § 9711. We will proceed to the merits of the Sixth Amendment complaint, which is resolvable on the record.

The substance of Lesko's claim is that counsel should have argued that the Eighth Amendment prohibits the duplicative use of evidence to establish multiple aggravating circumstances in the penalty phase. But this argument is thor-

**28.** In a footnote, Lesko also declares that "multiple weighing as aggravation of the same conduct" has been condemned by "many state courts" on various grounds. Brief of Appellant Lesko, at 50 n. 30, citing, *e.g.*, *Parsons v. Barnes*, 871 P.2d 516 (Utah 1994); *State v. Scott*, 177 Ariz. 131, 865 P.2d 792, 805 (1993) (opinion and cases relied on therein merely state, without explanation, that one fact cannot be weighed twice); *State v. Gay*, 334 N.C. 467, 434 S.E.2d 840 (1993) (opinion and cases cited therein rely on statutory construction and not on federal constitutional analysis); *Willie v. State*, 585 So.2d 660, 681 (Miss.1991) (court simply announced that "a jury cannot be allowed the opportunity to doubly weigh the commission of the underlying felony and the motive behind the underlying felony as separate aggravators," followed by string cite); *People v. Bigelow*, 37 Cal.3d 731, 209 Cal.Rptr. 328, 691 P.2d 994, 1006 (1985) (no independent analysis other than cite to prior cases from other states such as *Cook v. State*, 369 So.2d 1251, 1256 (Ala.1978), *State v. Rust*, 197 Neb. 528, 250 N.W.2d 867, 874 (1977), and *Provence v. State*, 337 So.2d 783 (Fla.1976)). As Lesko provides no further elaboration on this point, we will confine our review to his single discernible argument, directed only to the Tenth Circuit *McCullah* case decided after his resentencing.

oughly disingenuous: the single Tenth Circuit authority Lesko cites (which did not exist at the time of the sentencing) does not support his absolutist proposition; his argument fails to account for subsequent caselaw from that Circuit; and he ignores existing guidance from the U.S. Supreme Court, which, of course, is the pre-eminent, binding judicial source for what the Eighth Amendment could be said to prohibit.

In *McCullah*, the jury was presented with two statutory aggravating circumstances that the court concluded substantially overlapped. The first aggravating circumstance was that the defendant intentionally engaged in conduct which he knew created a grave risk of death and that such death resulted. The second aggravating circumstance was conduct intending that the victim be killed. The panel noted that, while the two circumstances were not identical *per se,* they "substantially overlapped"; and, indeed, the second circumstance "necessarily subsume[d]" the first one. The panel then summarily concluded that, "[s]uch double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *McCullah,* 76 F.3d at 1111. Lesko selects only the latter, generalized quote, while ignoring that the court's holding was premised upon one factor necessarily subsuming another. He then poses his selective account as if it defines Tenth Circuit law on the Eighth Amendment which, we are supposed to accept, also establishes the absolute parameters of the Eighth Amendment.

In addition to misrepresenting the *McCullah* case, Lesko's argument fails to disclose to this Court that *McCullah* is not even the Tenth Circuit's last word on the subject. Two years later, in *Cooks v. Ward,* 165 F.3d 1283 (10th Cir.1998), the court squarely rejected the very argument that Lesko now poses as if it were settled Eighth Amendment law. Pointing to the "substantially overlapping" analysis in *McCullah, Cooks* noted that *McCullah* did not "stand for the proposition that any time evidence supports more than one aggravating circumstance, those circumstances impermissibly overlap, *per se.*

The test we apply is not whether certain evidence is relevant to both aggravators, but rather, whether one aggravating circumstance 'necessarily subsumes' the other." *Id.* at 1289. Lesko's misleading argument concerning *McCullah*, thus, is patently meritless.

Furthermore, and also unacknowledged by Lesko's federal counsel is the fact that the U.S. Supreme Court has had the opportunity to address the *McCullah* court's reasoning in *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). The High Court avoided directly addressing *McCullah's* "double counting theory" because it ultimately concluded that the aggravating circumstances at issue were not duplicative. The decision in *Jones* was a plurality on this issue, as Justice Scalia did not join this part of the opinion. But what is significant is that the plurality opinion introduced this issue by stating, "[w]e have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid...." *Jones*, 527 U.S. at 399, 119 S.Ct. 2090. No member of the Court disputed this fact. The plurality opinion is further instructive because it squared with the *Cooks* opinion when it later concluded that, "the factors as a whole were not duplicative—at best, certain evidence was relevant to two different aggravating factors." *Id.*

Given this background, prior counsel obviously cannot be found ineffective for failing to formulate the Eighth Amendment issue Lesko has erroneously posed as a proposition certain, premised upon a misleading and incomplete account of the cases. In the case *sub judice*, there is no question that the challenged aggravating circumstances do not substantially overlap, much less does one "necessarily subsume" the other. Rather, by Lesko's own assertions, this is an instance where the same evidence was introduced in support of two different, and distinct, statutory aggravating factors. Such a circumstance does not implicate the constitutional concern he faults counsel for failing to invoke. *See Cooks, supra; cf. Jones, supra.* Accordingly, Lesko has not established that counsel's performance was deficient.

## J. Presumption of Life

■■■■ Lesko's next argument derives from the resentencing court's jury instructions respecting the verdict slip. Specifically, Lesko contends that the verdict slip instructions erroneously shifted the burden of persuasion to the defense, and "violated the presumption of life" by repeatedly telling the jury that it had to "reject a sentence of death" before it could "choose life." Lesko also appears to urge this Court to conclude, on collateral review, that an explicit instruction on the "presumption of life" is necessary in all capital cases to comport with constitutional concerns. Lesko contends that trial counsel was ineffective for failing to object to the trial court's instruction on these bases, and thereafter was ineffective for failing to raise the issue on direct appeal.

The PCRA court concluded that while the language of the sentencing court in explaining how to record its verdict on the slip was inartful, upon its review of the relevant charge as a whole, there was no error. In reaching this conclusion, the PCRA court considered that the portion of the charge that referred to recording the reasons for rejecting the death penalty appeared only in conjunction with the court noting that such an explanation was only required if the jury was recording a verdict of life imprisonment. PCRA Court Opinion, 8/7/2006, at 57, citing N.T., 2/17/95, at 33 ("If your sentence is life imprisonment, you should check the findings in C–1 or C–2 [on the verdict slip] which explain why your jury rejects the death penalty and imposes a life sentence."). The PCRA court also looked to the remainder of the charge, focusing on the fact that the trial court properly instructed the jury regarding aggravating and mitigating circumstances and the burdens of proof attendant to each. Thus, the PCRA court did not find arguable merit in Lesko's claim of ineffectiveness in failing to object to the court's jury instructions concerning how to record the verdict. We agree with the reasoning given by the lower court.

Preliminarily, we note that this Court has specifically rejected a claim that a capital defendant is entitled to a presumption of life charge. *Commonwealth v. Eichinger*, 591 Pa. 1, 915

A.2d 1122, 1138 (2007). Instead, we have held that jury instructions adequately convey the default in favor of life when the jury is instructed as to "the deliberately disparate treatment of the aggravating and mitigating circumstances under the applicable standards of proof" and the fact that "life in prison is the sentence unless the Commonwealth meets its high burden. . . ." *Id.* Moreover, when this Court has spoken of the "presumption of life" reflected in the penalty phase schemata, we were describing its practical operation (burdens of proof; levels of proof, relative weighing), consistently with restrictions dictated by the U.S. Supreme Court and the statute, which slant the inquiry in favor of life imprisonment. A synopsis of the practical operation of the capital penalty determination in an appellate opinion does not give rise to an entitlement to have what would amount to both a duplicative, and an argumentative, instruction concerning the jury's duty. Indeed, by definition, since the "presumption" arises as a result of the manner in which the jury's consideration is cabined, an accurate description of the process the jury must follow adequately conveys whatever "presumption" is operable.

Lesko's claim mischaracterizes the trial court's charge, both by ignoring its context, and by ignoring that the portion of the charge that is the basis for this claim concerned the mechanics of recording the verdict reached, and not the deliberations themselves. In point of fact, the trial court accurately explained the nature of aggravating and mitigating circumstances and the differing burdens of proof. Indeed, the trial court stressed that the different burdens of proof protected against "unjust death sentences." N.T., 2/17/1995, at 27. Additionally, the trial court emphasized that the jury could only impose a sentence of death if it could unanimously agree on one of two findings by stating:

As I told you earlier, you must agree unanimously on one of two general findings before you can sentence the defendant to death. They are a finding that there is at least one aggravating circumstance and no mitigating circumstances or a finding that there are one or more aggravating circum-

stances which outweigh any mitigating circumstances.... If all of you agree on either one of these two general findings, then you can and must sentence the defendant to death. When voting on the general findings, you are to regard a particular aggravating circumstance as present only if all of you agree that it is present. On the other hand, each of you is free to regard a particular mitigating circumstance as present despite what other jurors may believe.

*Id.*

Moreover, as the PCRA court found, the language regarding "rejecting" the death penalty was confined to a specific context when the trial court was directing the jury as to how it was to record, on the verdict slip, the verdict it had reached. It must be remembered that the verdict slip merely records the result of the jury's deliberation; it is not the deliberation itself, and the court's explanation of how to execute the slip is similarly discrete. The court first explained that in Part 1 of the verdict slip the jury was to enumerate the aggravating circumstances that the jurors had found that the Commonwealth proved beyond a reasonable doubt and the mitigating circumstances as found by any one of them by a preponderance of the evidence. Then, when explaining Part 2 of the verdict slip (relating to recording the jury's decision to impose a sentence of death), the trial court reiterated that the jury must unanimously agree that there was one or more aggravating circumstances and no mitigating circumstances or one or more aggravating circumstances which outweigh any mitigating circumstances **"before** [it] could sentence the defendant to death." *Id.* at 30 (emphasis added). It was only following these accurate instructions that the allegedly objectionable language arose when the trial court was explaining how the jury should fill out the verdict slip if the jury had reached a sentencing verdict of life in prison. The court explained that if the decision already so reached was a sentence of life in prison then it should check certain findings on the verdict slip. It then followed this instruction by stating, "[the findings] explain why you are rejecting as a jury the death penalty in imposing a life sentence." Thereafter, the trial court em-

ployed the phrase, "rejecting the death penalty" numerous times in the context of explaining this particular aspect of executing the verdict slip. *Id.* at 30, 31, and 33.

Based upon our review of the charge as a whole, we find no error in the PCRA court's decision. The trial court clearly, accurately, and properly instructed the jury regarding the respective burdens of proof related to the aggravating and mitigating circumstances. *See Eichinger, supra.* Furthermore, even if the repeated use of the phrase "rejecting the death penalty" in describing how to record the verdict already reached on the verdict slip was inartful, it was not erroneous when considered in context. As the PCRA court astutely observed, this phrase was only invoked when explaining to the jury how to use the verdict slip if it returned a verdict of life in prison. Accordingly, we agree that there is no arguable merit to this claim and Lesko has failed to establish that his counsel was ineffective.

### K. *Simmons* Charge

██ Lesko's next argument centers on trial counsel's failure to request that the jury be instructed that if he was sentenced to life in prison he would not be eligible for parole (a so-called "life means life" instruction, deriving from the plurality opinion in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994)). Lesko's argument before this Court does not attempt to account for the state of the law at the time counsel acted, but instead begins with a complaint that the PCRA court did not specifically address a list of bullet "subarguments" he now provides. Lesko's list consists of boilerplate, conclusory statements of supposed constitutional law, accompanied by unexplained string citations, with no attempt to tie the propositions to this case or to *Strickland.*[29] Following this indiscernible, "briefing by brain-

---

**29.** Ignoring that his claim is cognizable only as a claim of ineffective assistance, Lesko simply declares, *inter alia,* that the failure to issue a *Simmons* charge: violated the Eighth Amendment requirement that a capital jury consider all relevant mitigating evidence; violated the Eighth Amendment's protection against arbitrary and capricious sentences as the jury was not informed of all sentencing choices; offended

storming" argument, Lesko also requests that this Court revisit our prior case law concerning one aspect of *Simmons*, which holds that evidence in support of the significant history aggravator does not place future dangerousness at issue. In a particularly tortuous bit of reasoning, Lesko cites a 2002 case from the U.S. Supreme Court, *Kelly v. South Carolina*, 534 U.S. 246, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002), in support of his request that we alter our interpretation of *Simmons* and use that recalibration to find counsel ineffective in 1995.

The PCRA court concluded that it was bound by this Court's interpretation of *Simmons*, and therefore such an instruction is only warranted when the future dangerousness of the defendant is actually placed in issue. PCRA Court Opinion, 8/7/06, at 48. The PCRA court reasoned that the future dangerousness of Lesko was not an aggravating circumstance placed before the jury; thus, the *Simmons* instruction was not required and counsel could not be ineffective for failing to make such a request.

 The PCRA court's opinion speaks too narrowly on this issue, as future dangerousness can be injected into the proceedings in circumstances other than as a specifically proposed aggravating factor. Indeed, in *Simmons* the prosecutor raised the "specter" of "future dangerousness" in closing arguments. *Simmons*, 512 U.S. at 157, 165, 114 S.Ct. 2187. On the other hand, Lesko's arguments, requesting a broadening of our current law governing circumstances when a life means life instruction is required, and requiring that we fault counsel for failing to measure up to a new interpretation, are also without merit.

 This Court has considered this issue on multiple occasions and in various forms. Yet, in assessing counsel's performance, we always come back to the same rule of law

"evolving standards of decency" in violation of the Eighth Amendment; violated due process as the sentence was imposed based on inaccurate information; violated a supposed due process right to force the jury to choose between death and "life without possibility of parole;" and skewed the jury's weighing of aggravating and mitigating circumstances in violation of the right to a fair and impartial jury.

represented by *Simmons*, which was accurately set forth by the PCRA court and is that a life means life instruction is only required in those instances when the defendant's future dangerousness is placed at issue. *See Commonwealth v. Housman*, 604 Pa. 596, 986 A.2d 822, 837–38 (2009); *Commonwealth v. Wright*, 599 Pa. 270, 961 A.2d 119, 146–47 (2008); *Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1243 (2006); *Commonwealth v. Rompilla*, 554 Pa. 378, 721 A.2d 786, 795 (1998). We have also rejected the alternative argument that Lesko makes regarding whether admitting evidence to prove the significant history aggravator automatically injects future dangerousness into the sentencing proceedings. Even if we were inclined to revisit those decisions, the fact would remain that counsel's stewardship, in failing to ask for a *Simmons* charge (the year after the *Simmons* plurality decision was announced), cannot reasonably be questioned premised upon that changed view of the governing law. Accordingly, as Lesko's future dangerousness was not placed in issue by the mere fact that the significant history aggravator was argued and proved by the Commonwealth and as he does not point to any other evidence that injected future dangerousness into the proceedings, the PCRA court correctly concluded that counsel cannot be deemed ineffective for failing to request a *Simmons* charge.

### L. Jury Instructions on Aggravating and Mitigating Circumstances

Lesko's next three arguments concern the jury instructions regarding aggravating and mitigating circumstances. First, Lesko points to language in the trial court's instruction which directed the jury to consider whether the aggravating or mitigating circumstances made the first-degree murder of Officer Miller "more terrible" or "less terrible." According to Lesko, the federal constitution micromanages what courts can say on this score as well. Thus, Lesko argues that such instructions unconstitutionally required the jury to find a nexus between the mitigating circumstances and the crime committed, when the U.S. Constitution requires the jury

to consider any evidence that warrants a sentence less than death. Lesko does not address the fact that counsel failed to object to the charge at trial; nor does he argue in his brief that trial counsel was ineffective, under the state of the law extant in 1995, in connection with this claim. Like the claim related to the trial court's failure to permit him to introduce evidence of his co-defendant's sentence, although Lesko raised this issue in terms of trial counsel ineffectiveness in his PCRA petition, he has failed to present this claim in terms of counsel's ineffectiveness in his brief before this Court. Accordingly, this claim of trial court error is waived. *See* 42 Pa.C.S. § 9544(b).

■ Lesko's next argument concerns the trial court's refusal to instruct the jury regarding what he calls "the mitigating features of age." More specifically, he points to his supposed "emotional or psychological" age at the time of the offense and avers that the jury should specifically have been informed of these "mitigating features" in support of the age mitigating circumstance under Section 9711(e)(4). At the time of the murder, Lesko was 21. The trial court instructed the jury that Lesko's age could be considered as a mitigating circumstance, *see* N.T., 2/17/95, at 26. The trial court, however, refused Lesko's request to instruct the jury that in considering his age, the jury should consider his psychological and emotional age and level of maturity. Lesko acknowledges that his counsel requested such a charge, but asserts that counsel was ineffective for failing to pursue this issue on appeal.

The PCRA court acknowledged that U.S. Supreme Court case law indicates that "the background and mental and emotional development of a youthful defendant [must] be duly considered in sentencing," [30] but reasoned that the "emotional and psychological" consideration was encompassed by the court's general instruction to the jury to consider all other mitigating circumstances pursuant to Section 9711(e)(8). According to the PCRA court, "[t]he fact that 'age' means

---

**30.** The PCRA court cited *Eddings v. Oklahoma*, 455 U.S. 104, 116–117, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), for this proposition.

'emotional age' in addition to 'chronological age' is a matter that can be testified to by an appropriate expert witness, but is not an absolute instruction that should be given by the court." PCRA Court Opinion, 8/7/06, at 61.

The PCRA court's reasoning is sound. Lesko's claim here repeats his usual pattern when it comes to jury instructions: he proceeds from an assumption that the evidence and arguments he would proffer in support of a relevant consideration must also be converted into a binding jury instruction. But, instructions are designed to guide the jury's consideration of relevant evidence, not to reaffirm or approve of either party's slant on that evidence. Consistently with the death penalty statute, the jury here was instructed to consider Lesko's age at the time of the crime as potential mitigation. Lesko has not shown any basis in law for an entitlement to a more specific instruction that in considering his age (the relevant factor), the jury was obliged to specifically consider his theory concerning his supposed "emotional or psychological" age.[31] Furthermore, as noted by the PCRA court, Lesko's supposed "emotional or psychological" age may well have been a circumstance that was considered and accepted by the jury when assessing Lesko's background and in finding that he acted under the influence of extreme mental or emotional disturbance. Thus, Lesko has not demonstrated that trial counsel was ineffective for failing to pursue this issue on appeal.

 Lesko's final argument regarding the trial court's instructions on aggravating and mitigating circumstances fo-

---

**31.** It is worth noting that, in cases involving age as a disqualifying constitutional factor both for capital eligibility and eligibility for sentences of life imprisonment without possibility of parole, the U.S. Supreme Court has chosen strictly chronological, hard lines, even though the animating principle involved the same vicissitudes of youth that Lesko cites. *See Graham v. Florida*, —— U.S. ——, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) (Eighth Amendment prohibits sentence of life without parole for juveniles (defined as individuals under 18) who did not commit homicide); *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (Eighth Amendment prohibits imposition of capital punishment for offenders committing their crimes prior to age 18) Those over eighteen get no benefit from these constitutional decisions, irrespective of their subjective "psychological and emotional age and level of maturity."

cuses on the trial court's instruction directing the jury not to be "swayed" by sympathy, sentiment or other emotion. Counsel did not object. Lesko speculates that the word "swayed" conveyed to the jury that it could not give effect to feelings of sympathy or emotion when arriving at its sentence. Furthermore, according to Lesko, such an instruction negated and created an impermissible barrier to the role of sympathy as a mechanism by which to give effect to the actual mitigating evidence presented. Lesko also argues that his trial counsel was ineffective for failing to share his speculations and objecting to the word "swayed."

The PCRA court reasoned that a jury is not permitted to avoid imposing a sentence of death based on unbridled discretion or sympathy. Furthermore, the court pointed out that the trial court's instruction was substantially similar to the instruction found in the Pennsylvania Suggested Standard Criminal Jury Instructions. Accordingly, it deemed Lesko's underlying claim to be meritless. We agree.

Lesko's view of the role of "sympathy" in the jury's penalty deliberations fails to account for decisional law. Claims along this line have previously been considered and rejected by this Court on more than one occasion. Simply stated, "[a]s it is well established that a jury instruction not to allow feelings of sympathy to influence the sentencing consideration is constitutionally proper, counsel in this case were not ineffective in failing to object to such instruction." *See Natividad*, 938 A.2d at 340 (*quoting Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 818 (2007)). Lesko fails to acknowledge controlling law, and does not attempt to distinguish that law. We are not swayed by his claim.

## M. *Voir Dire*

Lesko's next four claims center on the absence of the resentencing *voir dire* transcripts from the record on his resentencing direct appeal. Lesko alternately faults his trial counsel for failing to secure those notes, and the resentencing court for failing to *sua sponte* see to it that the notes were transcribed. Lesko first claims entitlement to a "restoration"

of his appeal rights *nunc pro tunc* so that he can pursue the *voir dire* issues that counsel failed to raise on direct appeal, asserting that the absence of the transcript "effectively denied" him the ability to raise such issues on direct appeal. In addition he alleges that the absence of the jury selection notes supposedly rendered this Court unable to conduct its statutorily required review of the sentence for passion, prejudice or arbitrary factors as mandated by 42 Pa.C.S. § 9711(h)(3)(i). Lesko contends that he had a constitutional right to have the penalty phase jury selection notes transcribed for purposes of his appeal from resentencing and the failure to provide these transcripts resulted in the complete denial of his right to counsel under *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Alternatively, with regard to his first point, Lesko avers that he can demonstrate that the result of the direct appeal would have been different as he can establish that relief was due because of the specific *voir dire* errors that will be enumerated and discussed below.

The PCRA court reasoned that the statute and rules of court governing capital appeals required that the complete record be transcribed, including *voir dire* notes. *See* PCRA Court Opinion, 8/7/2006, at 49–50. It also concluded that counsel had no reason for failing to make such a request, since he admitted during the PCRA hearings that he "just assumed it would be transcribed for [this Court] and they would review it." The court disagreed, however, that Lesko's direct appeal rights should be reinstated *nunc pro tunc* as the relevant portion of the record was transcribed for PCRA counsel, PCRA counsel had the opportunity to review the transcripts, and counsel had identified alleged errors on collateral attack. Thus, the PCRA court addressed the specific claims identified by current counsel on the merits.

For reasons we will explain below, the PCRA court erred to the extent it accepted Lesko's argument that 42 Pa.C.S. § 9711(h)(2) and Pa.R.A.P. 2189 themselves imposed a stand-alone obligation on the part of the trial court to produce the "complete" record, including *voir dire* notes of testimony, for direct appeal. We also reject Lesko's argument that this

Court should grant him a *nunc pro tunc* appeal, or that we should presume that he was prejudiced *per se* by the mere failure to have the *voir dire* proceeding transcribed.

Preliminarily, we note that, although Lesko faults the trial court for the absence of the jury selection notes, and suggests that there is some obligation to "provide" a "complete" record in the abstract, that obviously is not the case. Rather, the appellant has a duty to frame what is needed. Thus, Rule 1911(a) of the Pennsylvania Rules of Appellate Procedure provides that "[t]he appellant shall request any transcript required under this chapter in the manner and make any necessary payment or deposit therefor in the amount and within the time prescribed by Rules 5000.1 et seq. of the Pennsylvania Rules of Judicial Administration (court reporters)." Of course, if a party is indigent, and is entitled to taxpayer-provided transcripts or portions of the record, he will not be assessed costs. But, that does not absolve the appellant and his lawyer of his obligation to identify and order that which he deems necessary to prosecute his appeal. The plain terms of the Rules contemplate that the parties, who are in the best position to know what they actually need for appeal, are responsible to take affirmative actions to secure transcripts and other parts of the record. *See, e.g., Commonwealth v. Steward,* 775 A.2d 819, 833 (Pa.Super.2001) (noting that it was not the responsibility of the trial court to order the notes of transcript of defense counsel's closing as Rule 1911 "makes it abundantly plain that it is the responsibility of the Appellant to order all transcripts necessary to the disposition of his appeal."); *Commonwealth v. Peifer,* 730 A.2d 489, 492 n. 3 (Pa.Super.1999) (explaining that it is the responsibility of the appellant and not the court to provide a complete record for review, including any necessary transcripts). Lesko cannot fault the trial court for his own failures. Instead, it is only when an appellant can show that a request was made and erroneously denied, which is not the case herein, that such a claim would have merit. *See Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 284–85 (2006). And that sort of claim ripens, and should be pursued upon, the very appeal that

supposedly was impeded by a missing portion of the record, which is also not the case here.

Moreover, even when notes of testimony are properly ordered, the absence of notes does not generate some instantaneous, meritorious claim for relief. Instead, if the initially missing notes matter, it becomes a circumstance the appellant or his counsel needs to respond to by, for example, ordering notes counsel failed to order earlier; or seeking an order of court to have ordered notes promptly transcribed, or otherwise made available; or, where notes cannot be secured, to take steps to have an equivalent picture of the proceeding generated. *See* Pa.R.A.P. 1911(a); Pa.R.A.P. 1923 (statement in the absence of transcript); Pa.R.A.P. 1924 (agreed upon statement of the record).

There may be circumstances when the absence of notes of testimony hampers this Court's statutorily mandated direct appeal review of death sentences under 42 Pa.C.S. § 9711(h)(3)(i) (mandating review of death sentence to determine whether it was result of passion, prejudice, or other arbitrary factor). And, thus, on a direct appeal, if the facts warranted the assertion, an argument could be forwarded that a portion of the record was missing, through no fault of the appellant, which impeded statutory review; and the appellant could request some court action to secure that which was missing, or to direct creation of an equivalent picture. But, this is not the type of situation Lesko poses. Instead, Lesko's argument turns the shield of statutory review into a sword. He argues that the absence of *voir dire* notes should be deemed to have automatically impeded this Court's statutorily mandated review for passion, prejudice, or other arbitrary factor, and thereby created a collateral right to automatic relief—even if he never took measures to secure the notes, and never objected to their absence on direct appeal. In addition to ignoring the duty of an appellant to identify and request relevant portions of the record, Lesko's argument fails to recognize the very limited purpose of review pursuant to Section 9711(h)(3)(i).

Generally, an action may be deemed arbitrary if it is not cabined by law or principle. *Commonwealth v. Boczkowski*, 577 Pa. 421, 846 A.2d 75, 102 (2004) (citing BLACK'S LAW DICTIONARY 100 (SEVENTH ED.1999)). Similarly, the Legislature's use of the terms "passion and prejudice," suggests a review scheme whereby this Court ensures that the jury's sentencing decision was the result of law and principle and not some extraneous factor. Based upon this very limited review prescribed by Section 9711(h)(3)(i), it is not at all apparent how the absence of *voir dire* transcripts would hamper this Court's statutorily mandated review under Section 9711(h)(3), which exists merely to ensure that the jury's sentence of death was based upon law and principle. *Cf. Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 777 (1998) (potentially improper statements made during *voir dire* are of "less direct relevance to the jury's ultimate sentencing decision."). Instead, like most instances where a portion of the transcript was missing, "to be entitled to relief due to the incompleteness of the trial record the defendant must make some potentially meritorious challenge which cannot be adequately reviewed due to the deficiency in the transcript." *Commonwealth v. Marinelli*, 589 Pa. 682, 910 A.2d 672, 688 (2006). And, in this case, as we have noted that any fault for the "missing" transcripts fell squarely at counsel's feet, any such meritorious claim has to be raised as a claim of counsel's ineffectiveness, which requires Lesko to identify and develop the specific, defaulted *voir dire*-related issue he believes would have won the day on direct appeal.

Similarly meritless is Lesko's argument that this Court should review his claim under the "presumed prejudice" standard announced by the High Court in *Cronic*. This Court has rejected an identical claim on a prior occasion. *See Jones*, 912 A.2d at 285. Briefly, *Cronic* stands for the proposition that a court will presume prejudice under certain limited circumstances if the defendant is denied counsel totally or at a critical stage of the proceedings. If Lesko could establish that the circumstances on direct appeal amounted to a total denial of counsel, warranting a presumption of prejudice, he would be

entitled to *nunc pro tunc* relief. *See, e.g., Commonwealth v. Halley*, 582 Pa. 164, 870 A.2d 795 (2005) (*nunc pro tunc* relief appropriate when counsel failed to filed 1925(b) statement, thereby waiving all issues); *Commonwealth v. Lantzy*, 558 Pa. 214, 736 A.2d 564 (1999) (*nunc pro tunc* relief appropriate when counsel failed to file requested direct appeal). But counsel's failure to request and secure the transcripts from *voir dire* did not amount to a constructive denial of counsel on appeal. This Court has held that the filing of an appellate brief, deficient in some aspect or another, which operates to default some claims, does not constitute a complete failure to function as a client's advocate so as to warrant a presumption of prejudice under *Cronic*. *See Commonwealth v. Reed*, 601 Pa. 257, 971 A.2d 1216, 1226 (2009). Yet, this is precisely the type of argument Lesko attempts to forward in this collateral appeal. This is not an instance where counsel failed to file a direct appeal at all, or filed an appeal that was doomed because all claims were later defaulted by counsel's lapse. Instead, counsel filed a direct appeal in which he forwarded numerous claims respecting the new sentence of death, which were decided on their merits. Whether counsel perceived no claims relating to *voir dire*, elected not to pursue such claims as he perceived, or simply failed to consider looking to *voir dire* for claims, the fact remains that Lesko had a fully counseled appeal. Whatever issue-specific complaints Lesko has respecting counsel's appellate performance sound in *Strickland*, not *Cronic*.

In summary, Lesko's only cognizable claim arising from the absence of *voir dire* notes on his direct appeal must sound in prior counsel's ineffectiveness. We turn now to the individual claims respecting *voir dire* that Lesko, in the alternative, asserts counsel was ineffective for failing to discover and forward.

█ First, Lesko challenges the "misstatements of law" that, he believes, the trial court made during juror selection. Specifically, Lesko points to the trial court's language, which repeatedly described aggravating circumstances to the prospective jurors as circumstances that make the crime "more

terrible" and mitigating circumstances as circumstances that make the crime "less terrible." Lesko links this supposed error to the previous allegation, addressed and rejected above, regarding the jury instructions issued before deliberations, and speculates that the combination of these errors produced a jury overly oriented to death. In a similar vein, Lesko asserts that the trial court failed to inform the first two empaneled jurors that mitigating circumstances could encompass any aspect of Lesko's background or character, even those not directly connected to the circumstances of the crime.

The PCRA court employed identical reasoning to that expressed when it reviewed Lesko's challenges to the jury instructions at the conclusion of the proceedings. The PCRA court found that, upon considering the charge in its entirety, the burden was not improperly shifted to Lesko. Accordingly, the court dismissed the underlying claim as meritless.

It is well-settled that the purpose of *voir dire* is to ensure the empanelling of a fair and impartial jury capable of following the instructions of the trial court. *See Commonwealth v. Montalvo*, 604 Pa. 386, 986 A.2d 84, 93 (2009). We agree that counsel was not obliged to object to the court's language which merely tried to give prospective jurors a sense of the roles of aggravators and mitigators in capital cases.

As we stated previously, the trial court's description of aggravating and mitigating circumstances as factors that made the crime "more terrible" or "less terrible" was not an error. Moreover, contrary to Lesko's apparent view that his take on federal constitutional law provides a basis for micromanaging all utterances in a capital trial, nothing in the law obligated trial counsel, engaged in the process of jury selection, to parse the court's words and offer argumentative alternatives. The court's engagement with the jury in *voir dire* is not of the same magnitude as its role and interaction in describing to the selected jurors their actual obligations at the point where they retire to deliberate on the penalty verdict. Furthermore, any arguable omission regarding the broad character of mitigating circumstances during *voir dire* was

later corrected by the trial court's proper instructions that told the jury that that it could consider "any other mitigating matters concerning the character and record of the defendant or the circumstance or circumstances of his offense, including but not limited to, that the defendant is repentant. . . ." N.T., 2/17/1995, 26–27. Accordingly, this claim of ineffectiveness is meritless.

Lesko's next challenge arising from *voir dire* involves the trial court's decision not to grant the defense's challenge for cause regarding two prospective jurors. Lesko asserts that the trial court abused its discretion in this regard. He also points out that he exercised all of his peremptory challenges and asserts that the erroneous impairment of his right to use peremptory challenges is reversible error. At the end of his argument, Lesko adds a general averment that trial counsel was ineffective for not "fully litigating" this issue and for not pursuing it on appeal.

■ Generally speaking, this Court has indicated that a trial judge may properly refuse to excuse a juror for cause where the judge believes that the juror would be able to be fair and impartial. *Commonwealth v. Marshall*, 534 Pa. 488, 633 A.2d 1100, 1104 (1993). "Such a determination is to be made by the trial judge based on the juror's answers and demeanor, and will not be reversed absent a palpable abuse of discretion." *Id.* Expounding on the fair and impartial concept, this Court has given more specific guidance, explaining:

The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor. . . . It must be determined whether any biases or prejudices can be put aside on proper instruction of the court. . . . A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to

questions.... The decision on whether to disqualify is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion....

*Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293, 299 (1996) (quoting *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811, 818 (1985), *abrogated on other grounds by Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136 (2001)).

 The first prospective juror that Lesko focuses on is Juror 52. The relevant portion of his *voir dire* testimony, according to Lesko, shows that Juror 52 "would be unable to consider" any mitigating circumstances if the crime involved the killing of a police officer and was committed by a person who had committed other murders. Specifically, Lesko points to the following excerpt from Juror 52's testimony:

Q. Do you believe that the death penalty is the only appropriate punishment for first degree murder of a police officer in the line of duty where the defendant has been convicted of other murders without regard to mitigating circumstances?

A. Yes.

[TRIAL COUNSEL]: That's all I have.

THE COURT: Did you understand that?

A. Yes. In other words, for killing a police officer, I think it should be the death penalty. But you got to listen to everything first.

N.T., *Voir Dire,* at 417. Lesko also cites to a further exchange with the trial court, on page 418, as further proof of the juror's supposed bias.

The PCRA court determined that after reading the entire transcript surrounding Juror 52's testimony (not just the select exchanges Lesko cites), the trial court did not abuse its discretion in concluding that the prospective juror could set aside his personal beliefs and follow the court's instructions.

Although the select portion of the *voir dire* of Juror 52 quoted by Lesko might be troubling in isolation, as the PCRA

court's opinion implicitly recognized, Lesko's argument fails to acknowledge what came after this exchange. The trial court's rather lengthy follow-up examination elicited that the prospective juror was confused by this line of questioning. When he was asked to put his understanding of the law in his own words, the juror stated, "I would listen to both sides and think for myself what I would, you know, vote." *Id.* at 421. Furthermore, after trial counsel asked that the juror be excused for cause, the trial court brought the juror back for yet further questioning. During this follow-up examination, the juror appeared to understand the law and indicated unequivocally that he would not find that the potential aggravating circumstances at issue in this case automatically outweighed any mitigating evidence. *Id.* at 428. (Notably, the jury, of which this juror was a part, found four mitigating circumstances.) Lesko's argument, in short, is premised upon a misrepresented account of the juror's overall testimony. Accordingly, we agree with the PCRA court that Lesko has failed to prove that trial counsel was ineffective in failing to pursue this discretionary claim on appeal.

Lesko's next-challenged prospective juror, Juror 146, was a self-identified "news bug," who had extensive familiarity with background information about the case from following it in the local news. Specifically, Juror 146 knew that Lesko had received the death penalty following the first trial, knew that Lesko (along with Travaglia) had committed three other murders and knew some of the details surrounding those murders, knew Judge Mihalich casually (it appears that they were neighbors at some point and may have graduated from high school together), and knew that Judge Mihalich had made statements to the press following Lesko's prior trial, but could not remember the substance of the statements.[32] This partic-

32. The statements by Judge Mihalich referred to in the text are statements that he made to the press following the PCHA hearing. Notably, the statements were later cited as the basis for an appellate issue raised by co-defendant Travaglia, who argued that Judge Mihalich should have recused himself from the PCHA proceedings. *See Commonwealth v. Travaglia,* 541 Pa. 108, 661 A.2d 352, 369–70 (1995). This Court

ular juror also expressed some confusion about the law, stating that he believed the death penalty was automatic for any defendant convicted of killing a police officer and indicating that he could not "understand why they had to retry [Lesko]. That always bothered me. But of course the law, there is so many loopholes...." N.T., *Voir Dire*, 2/6/95, at 438–42. Lesko argues that a combination of this prospective juror's knowledge of inadmissible facts, specifically the fact that the death penalty was imposed following the first trial, and his misunderstanding of the law, demonstrated that Juror 146 was predisposed to impose a sentence of death. For these reasons, Lesko contends that the trial court should have granted trial counsel's challenge for cause, trial counsel was ineffective for failing to "fully litigate" the claim before the resentencing court and counsel should have pursued the issue on appeal.

Again, the PCRA considered the juror's testimony in its entirety, concluded that the trial court properly exercised its discretion in denying the challenge for cause, and thus rejected Lesko's underlying claim.

As was the case with the prior juror, there obviously were sufficient concerns with this prospective juror's initial testimony that trial counsel moved to excuse him for cause. But the motion having been denied in the trial court's discretion, we see no merit in Lesko's current claim that counsel was obliged to pursue the claim on appeal. The transcript is replete with testimony by Juror 146 that supported the trial court's discretionary decision. The juror made clear that he could follow the law. The juror repeatedly stated that he would be able to consider the aggravating and mitigating circumstances before reaching a conclusion. *See id.*, at 426, 427, 428, and 432. The juror also stated that he could put his prior knowledge of the case out of his mind in rendering a verdict. *See id.*, at 433 and 442. The trial court was obviously better positioned than an appellate court, or a collateral review court, to assess the credibility of a prospective juror's assurances, a fact which correspondingly reduces the likelihood of success in an appel-

concluded that the PCHA court did not abuse its discretion in denying Travaglia's motion for recusal.

late challenge to such a discretionary decision. Accordingly, based on our review of the entirety of the testimony by Juror 146, we see no error in the conclusion of the PCRA court. For this reason, Lesko cannot demonstrate that his trial counsel was ineffective for failing to "fully litigate" the issue or pursue the issue on direct appeal.

Lesko's next argument derives from what he alleges was the inconsistent and irreconcilable treatment of two different prospective jurors whose examinations revealed similar questions regarding their collateral knowledge of the law. Specifically, Lesko notes that the trial court granted the Commonwealth's challenge for cause after a juror questioned whether life in prison meant there was no possibility for parole. On the other hand, Lesko complains, the trial court did not grant a defense challenge for cause after a prospective juror questioned whether there would be "anymore [sic] levels of appeal." Lesko points out that the second juror was the final juror empaneled [33] and he avers that the trial court's inconsistent treatment of the two jurors violated due process, citing *Ham v. South Carolina*, 409 U.S. 524, 526–27, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973), as support. Lesko also acknowledges that trial counsel litigated the dismissal of the first juror for cause on direct appeal, but, to avoid the previous litigation bar, he avers that counsel did so ineffectively since he failed to juxtapose the trial court's handling of that juror with the court's allegedly inconsistent handling of the second juror for raising a similar question.

In resolving this question, the PCRA court concluded that Lesko was comparing "apples and oranges." PCRA Court Opinion, 8/7/06, at 53. The court acknowledged that if the trial court had acted inconsistently with regard to two jurors

---

**33.** Lesko links this argument with the prior argument, asserting that the trial court's prior failures to grant meritorious challenges for cause violated due process by denying Lesko his full Rules-based complement of peremptory challenges. Related to this issue, Lesko points to trial counsel's testimony at the PCRA hearing where he stated that he would have struck this particular juror if he had any peremptory challenge remaining. We need not consider these additional arguments as we have concluded that the trial court did not abuse its discretion in denying defense counsel's challenges for cause.

who had asked the same question, *i.e.*, about the possibility of parole for a life sentence, then it would find an inconsistency in the trial court's rulings. Here, however, the second juror asked a question about a different legal procedure and then specifically assured the court that her knowledge of the appeals process would not affect her verdict. Thus, the PCRA court concluded that there was no merit to Lesko's contention. We agree that Lesko has not shown that counsel was ineffective in the manner in which he litigated this claim on appeal.

In *Ham, supra*, the U.S. Supreme Court concluded that the trial court committed reversible error when it did not permit the defendant to question prospective jurors as to racial bias under the particular circumstances of that case. *Ham* does not stand for the broad proposition for which Lesko cites it. Indeed, the U.S. Supreme Court has clarified that the decision in *Ham* was not of universal application. *See Ristaino v. Ross*, 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976). Lesko does not cite the *Ristaino* case.

In any event, the situation presented here is different from that in *Ham*, as the question presented implicates the alleged inconsistent treatment of two prospective jurors. The record amply supports the PCRA court's finding that the inquiries by the two jurors were sufficiently distinct, in the circumstances, that there was no cognizable disparate treatment that counsel was constitutionally obliged to forward as part of his appellate claim. Additionally, as the PCRA court noted, it seems self-evident that prospective jurors will have a divergent range of knowledge and backgrounds and the linchpin in ruling upon challenges for cause must be whether the juror can be "fair and impartial." *See Marshall, supra.* In this vein, the second juror indicated that her knowledge of the appeals process would not have any bearing on her decision. N.T., 2/8/1995, Excerpt of Jury Selection (Voir Dire), at 11. Accordingly, Lesko cannot prevail on his claim.

## N. General Challenges

Finally, Lesko raises two summary claims. The first is a claim that the cumulative effect of all of the errors he

has alleged warrants a finding of prejudice, such that a new trial and sentencing phase is warranted. We have deemed two claims to be arguably meritorious and disposed of them solely on grounds of lack of prejudice—the *Brady* claims and the ineffectiveness claim related to remorse, where we assumed arguable merit. The notion of "cumulating" prejudice does not easily flow from our disposition of such disparate claims. We note, however, that the measure of *Brady* materiality and *Strickland* prejudice are the same: a grant of relief depends upon finding a reasonable probability that the result of the proceeding would have been different. *Compare Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("[*Brady* ] evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different,' ") *with Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.") Even cumulating the ineffectiveness/remorse claim and the *Brady* claims, all deemed insufficiently prejudicial on their own, we have no doubt that the outcome of the resentencing would have been the same, given the jury's specific findings, the strength of the aggravators, and common sense. Accordingly, this claim fails. *Cf. Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009).

Finally, Lesko avers that he was denied meaningful appellate review of his case when he was not given the opportunity to demonstrate a number of systemic defects in this Court's proportionality review database. Lesko avers that he should have been afforded an evidentiary hearing to establish his claim. Additionally, Lesko attacks his trial counsel's ineffectiveness for failing to participate in the proportionality review process. This Court has examined the issue attacking the method employed by this Court in conducting proportionality review on prior occasions and has concluded that our proportionality review met the requirements of 42 Pa.C.S. § 9711(h)(3)(iii). *See Commonwealth v. Spotz*, 587 Pa. 1, 896

A.2d 1191, 1249 (2006) (and cases cited therein). Accordingly, we will not consider this issue anew.

For the reasons stated herein, we reverse the order of the PCRA court, granting Lesko a new trial and a new penalty hearing, and we dismiss the petition for PCRA relief.

Jurisdiction relinquished.[34]

Justices EAKIN, BAER, McCAFFERY and ORIE MELVIN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice TODD files a concurring and dissenting opinion.

Justice SAYLOR, concurring.

I join Parts I, II, and III(A), (B), (D), (E), (F), (G), and (I) of the Majority Opinion, as well as its holding.

As to Part III(C), pertaining to trial counsel's stewardship in the investigation and presentation of evidence in mitigation, I find the PCRA court's conclusions relative to arguable merit and lack of reasonable strategy to be amply supported in the record.[1] However, I agree with the majority's holding concerning prejudice. See Majority Opinion, at 193–98, 15 A.3d at 383–87.

In this regard, I find this case to be very different from the *Sattazahn* decision, which I authored, and which is cited in the concurring and dissenting opinion. See Concurring and Dissenting Opinion, at 261–63, 15 A.3d at 424–26. In particular,

---

**34.** The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

**1.** In particular, I agree with the PCRA court that trial counsel's eleventh-hour preparation in a capital case exemplifies the deficient stewardship. While the majority shifts the responsibility for any lapses from counsel to the mental-health expert, Dr. Levit, *see* Majority Opinion, at 190–92, 15 A.3d at 382–83, Dr. Levit appears to have been put in a very difficult situation, as he was contacted after the trial *voir dire* process already was underway. *See, e.g.,* N.T., Dec. 15, 1999, at 183 (reflecting Dr. Levit's testimony that he did not have time to elicit extensive information from family members, "nor was there time between the time I was contacted and the time of the trial to go into any depth"); *accord Commonwealth v. Lesko,* No. 681 C 1980, *slip op.* at 11 (C.P. Westmoreland Aug. 7, 2006) ("The inadequacy of Dr. Levit's evaluation

the penalty-phase presentation in *Sattazahn* was truly paltry.[2] Moreover, the little evidence that was presented there was of the humanizing type, *see Sattazahn*, 597 Pa. at 676 n. 8, 952 A.2d at 656 n. 8, as opposed to explanatory-type mitigation, which was presented in the *Lesko* resentencing proceedings at considerable length, *see* Majority Opinion, at 190–91, 15 A.3d at 381–82. *See generally Commonwealth v. Brown*, 582 Pa. 461, 521, 872 A.2d 1139, 1174 (2005) (Saylor, J., dissenting) (discussing the differences between humanizing- and explanatory-type mitigation, as well as one court's observation that "[w]e have rarely granted habeas relief based solely upon humanizing, rather than explanatory mitigation evidence in the face of extensive aggravating circumstances" (citation omitted)).

Indeed, the present circumstances seem to me to be much closer to the scenario in *Commonwealth v. Miller*, 605 Pa. 1, 987 A.2d 638 (2009), in which the Court recently affirmed a denial of post-conviction relief. *See id.* at 40–54, 987 A.2d at 662–69.[3] My reasoning in the present case is also similar to that supporting my concurrence in the denial of post-conviction relief in *Commonwealth v. Cox*, 603 Pa. 223, 290–91, 983 A.2d 666, 707 (2009) (Saylor, J., concurring), *Commonwealth v. Clayton*, 572 Pa. 395, 407, 816 A.2d 217, 223–24 (2002) (Saylor, J., concurring), and *Commonwealth v. Bond*, 572 Pa. 588, 622, 819 A.2d 33, 53 (2002) (Saylor, J., concurring).

Justice TODD, concurring and dissenting.

## I. GUILT PHASE

With respect to the disposition regarding the guilt phase, I join the Majority Opinion in reversing the Post Conviction

was further exacerbated by the fact that he was hired at the last minute.").

**2.** In terms of quantity alone, the defense evidentiary presentation in *Sattazahn* spanned eight pages of the penalty-hearing transcript, *see Commonwealth v. Sattazahn*, 597 Pa. 648, 674, 952 A.2d 640, 655 (2008); whereas, the defense presentation on resentencing in *Lesko* spans three volumes of the transcripts.

**3.** In *Miller*, for my part, I also differed with the majority finding of a reasonable strategy relative to a truncated mitigation investigation, but I did not reach the prejudice issue in *Miller* as I felt additional development was required in the post-conviction court. *See Miller*, 605 Pa. at 67–72, 987 A.2d at 678–80 (Saylor, J., dissenting).

Relief Act ("PCRA") court's order granting Appellant John Lesko a new trial.

## II. PENALTY PHASE

With respect to the disposition regarding the penalty phase, I respectfully dissent from the Majority Opinion insofar as it reverses the PCRA court's order granting Lesko a new penalty hearing. For the following reasons, I would affirm the PCRA court in that regard.

The PCRA court granted Lesko a new penalty trial based on his claims that Attorney Marsh was ineffective for, *inter alia*, (1) failing to retain a neuropsychologist for the purpose of providing a reliable evaluation of Lesko's mental health and/or organic brain damage; and (2) retaining a clinical psychologist, but neglecting to provide sufficient preparation time or material collateral information to allow the psychologist to conduct an appropriate evaluation and reach a reliable diagnosis. In doing so, the PCRA court stated:

> Three years before the 1995 sentencing, and in anticipation thereof, trial counsel, Mr. Marsh[,] consulted University of Pittsburgh law professor Welsh White with regard to the relationship between child abuse and brain damage. In October 1992, Professor White provided Mr. Marsh with literature on the topic and a sample motion to obtain psychological and neurological testing of the Petitioner. Mr. Marsh recognized that child abuse and neglect were significant factors in the Petitioner's argument that a life sentence should be imposed, rather than death, and he agreed that evidence of brain damage would be a "very important matter to bring to the attention of the jury."

> Nonetheless, and despite having been advised otherwise, Mr. Marsh retained a clinical psychologist, Herbert Levit, Ph.D., on February 6, 1995, after jury selection had already begun for the second sentencing trial and only three days before the trial commenced. In counsel's own words, he hired Dr. Levit "on the eve of trial."

Dr. Levit is not a neuropsychologist, and as a consequence, was incapable of conducting a neuropsychological assessment of the Petitioner's cognitive functioning. Furthermore, Mr. Marsh did not specifically advise Dr. Levit that he had been apprized [sic] of the link between abuse and organic brain damage, and that that may be an area of relevant inquiry. As a result, Dr. Levit conducted a standard mental status examination, which was not designed to detect either cognitive or organic dysfunction.

The inadequacy of Dr. Levit's evaluation was further exacerbated by the fact that he was hired at the last minute. Within the week prior to the examination, he reviewed a summary report that had been prepared by the investigative firm, Alfonso Associates, and he had telephone conversations with two family members. He did not review any prior psychological or psychiatric evaluations, although he was aware that the records existed. He did not review any of the trial transcripts or any of the discovery materials. He did not review or consider any of the voluminous collateral information in the Children and Youth Services records that contained detailed information concerning the Petitioner's life history. As a result, based upon limited information, he made an assessment of the Petitioner's personality, and concluded that the Petitioner suffered from Borderline Personality Disorder and Polysubstance Abuse.

During the PCRA proceedings, the Petitioner presented the testimony of Dr. Barry Crown, a neuropsychologist who testified that both the institutional records and Dr. Levit's evaluation contained indicia of brain damage that would have been revealed with neuropsychological testing tools and a properly qualified and competent evaluator.

Dr. Crown painstakingly went through the institutional records and noted those entries that would be red flags to anyone who was trained to diagnose the presence of organic brain damage: the Petitioner had an unusual gait, exhibiting some form of psychomotor difficulty at an early age; uninhabitable and deplorable housing conditions (inoperable windows, broken doors, floors falling apart, lead-based

paint, absence of hot and cold running water, animal and human feces on surfaces in the home, decaying food on the counters and in the refrigerator, and an infestation of insects and flies); general and continuous neglect of the Petitioner's and his siblings' health; the Petitioner played with dead rats; and the Petitioner was set on fire by boys in the neighborhood, which resulted in a one-month stay in the hospital. He explained that these facts have neuropsychological significance because the combination of "general neglect" and "a young child under stress, we know ... produces difficulties at critical stages in brain development." Growing up in deplorable conditions is neuropsychologically significant and constitutes an indicator of brain damage that should be further explored.

The records contained relevant information concerning the Petitioner's physical well-being and his behavior as a child that were significant to Dr. Crown's neuropsychological investigation. The Petitioner suffered from childhood insomnia, hyperactivity and headaches; he was described as having "episodic dyscontrol," a form of organically impaired impulse control; he chronically suffered from inadequate nutrition; his mother was a chronic drinker, indicating the possibility that the Petitioner was subject to fetal alcohol involvement; a long and continuing history of high fevers and ear problems; and multiple indications of head trauma (assaulted by other children and punished aggressively at home).

The records also contained significant references to a long history of drug and alcohol abuse and exposure to environmental toxins. At an early age—as early as 8 years old—the Petitioner started drinking alcohol, huffing over-the-counter toxic substances, experimenting with illegal drugs, and eating paint chips. Dr. Crown explained how damaging it is to the brain to ingest alcohol and other toxins at a young age, when the brain is still developing. Furthermore, he noted that the records disclosed a history of blackouts, which would also indicate a history of alcohol-related brain cell damage.

All of the above references in the records were indicators that neuropsychological assessment for brain damage was needed.

In addition to the institutional records, there were numerous red flags in Dr. Levit's report that indicated that neuropsychological testing should be conducted. The Wechsler Adult Intelligence Scale ("WAIS") intelligence test that was administered by Dr. Levit revealed significant differences among the test scores both between the Verbal and Performance categories and the inter-test scatter. According to Dr. Crown, both sets of test scatter provided neuropsychologically significant evidence of brain damage. Not only did the test scoring suggest the need for further testing to ascertain the presence of brain damage, but is itself "a pathognomic sign[, m]eaning that it represents the very strong possibility and likelihood of a pathology, of an impairment, of a deficit" and "would be an extremely strong indicator of . . . the strong likelihood of organic brain damage."

Likewise, the results of Dr. Levit's administration of the Bender Visual Motor Gestalt Test and the House–Tree–Person Test provided data that suggested the need for further neuropsychological testing.

In addition to the psychological test results, Dr. Crown noted that Dr. Levit's diagnosis of Borderline Personality Disorder raised important issues relating to the possibility of brain damage—the symptoms of Borderline Personality Disorder substantially overlap the behavior manifestations of organic brain damage. Accordingly, Dr. Levit's diagnosis, although limited, was yet another sign that the Petitioner may be suffering from organic brain damage.

In corroboration of Dr. Crown's suspicions, the Allegheny County Children and Youth Services records that were not provided to the defense until the April 2002 PCRA hearing, also contained substantial evidence to support a conclusion that further neuropsychological testing of the Petitioner was indicated. Among the indicators were the results of intelligence tests by school psychologists that were significantly similar to the most recent test results, and evidence that the

Petitioner's siblings, as well, suffered from brain damage, dysfunction and mental retardation.

On October 28, 1999, Dr. Crown administered a complete neuropsychological test battery to the Petitioner. As a result of the Petitioner's performance on those tests, Dr. Crown concluded to a reasonable degree of neuropsychological certainty that the Petitioner is brain damaged and was brain damaged at the time of the offense. The Commonwealth did not offer any expert testimony in opposition to Dr. Crown's diagnosis and was unable to discredit Dr. Crown's methodology or conclusions on cross-examination. As a consequence of his findings, Dr. Crown determined that, at all relevant times, the type of brain damage from which the Petitioner suffered, and continues to suffer, constitutes an extreme and emotional disturbance (42 Pa.C.S. § 9711(e)(2) mitigating circumstance) and a significant impairment in his ability to appreciate the criminality of his conduct or conform his conduct to the requirements of law (42 Pa.C.S. § 9711(e)(3) mitigating circumstance).

Only after Dr. Levit had an opportunity to review the institutional records, as a consequence of the filing of the PCRA petition and the preparation of the case by new counsel, was he able to recognize the deficiencies in his original evaluation, and recommend neuropsychological testing to confirm the likelihood of brain damage. His new diagnoses and findings included post-traumatic stress disorder; failure to thrive syndrome; substantial impairment in Petitioner's capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of the law; probable brain damage; and the failure of social services to rescue Petitioner and his siblings from the abject environment in which they were raised.

PCRA Court Opinion, 8/7/06, at 10–15 (record citations and footnotes omitted).

Based on the foregoing, the PCRA court concluded: "the testimony of a neuropsychologist at the sentencing hearing with regard to [Lesko's] organic brain damage would have added significant additional and relevant information for the jury to consider as it weighed mitigating factors against the

aggravating factors;" there was no reasonable basis for Attorney Marsh's failure to present such testimony; and there was a reasonable probability that, but for Attorney Marsh's ineffectiveness, the results of the penalty proceeding would have been different. PCRA Court Opinion, 8/7/06, at 16. The PCRA court also concluded that Attorney Marsh was ineffective for failing to investigate and present mitigating evidence, including evidence of extraordinary abuse and neglect that Lesko endured as a child. Based on these findings, the PCRA court determined Lesko was entitled to a new penalty hearing.

With respect to the PCRA court's determination that Attorney Marsh was ineffective for failing to retain the services of a neuropsychologist to present evidence that Lesko suffered from organic brain damage, the Majority finds error in the PCRA court's analysis because "it placed the burden of an expert's knowledge on counsel's shoulders and framed the reasonable strategy question narrowly without considering the course actually pursued by counsel at the resentencing." Majority Opinion at 186, 15 A.3d at 379–80. The Majority further "caution[s] that, in applying *Strickland,* courts must be careful not to conflate the roles and professional obligations of experts and lawyers," noting:

> it is telling that Dr. Crown's testimony at the PCRA hearing was directed at the examination conducted by Dr. Levit and not the strategy of counsel; thus, Dr. Crown opined that the results of some of the testing conducted by Dr. Levit raised "red flags," which indicated that neuropsychological testing should be conducted. Certainly, these psychological "red flags" could not be directed at counsel, who was unschooled in mental health matters, but were directed at Dr. Levit. In fact, by the neuropsychologist's own testimony, the diagnosis of Borderline Personality Disorder—a diagnosis made by Dr. Levit, not trial counsel—should have raised a question relating to the possibility of brain damage. Again, such opinions, if valid, may call into question Dr. Levit's professional performance, but that is not the same thing as providing a basis to fault trial counsel's legal performance.

*Id.* at 190, 15 A.3d at 382. I respectfully disagree with the Majority's determination in this regard.

As the PCRA court recognized, Attorney Marsh became aware of the link between child abuse and brain damage after consulting with Professor White in 1992. Attorney Marsh also was aware that Lesko had been severely abused and neglected as a child, and testified that he knew that evidence of brain damage would be a "very important matter to bring to the attention of the jury." N.T. PCRA Hearing, 12/14/99, at 134. Notwithstanding this knowledge, and despite the fact that Professor White provided Attorney Marsh with a sample motion to obtain psychological and neurological testing of Lesko, on the eve of trial Attorney Marsh retained a clinical psychologist—Dr. Levit—as opposed to a neuropsychologist to evaluate Lesko.

Moreover, despite the information counsel obtained from Professor White regarding the link between child abuse and brain damage, and despite his knowledge of Lesko's abusive childhood, Attorney Marsh failed to either alert Dr. Levit of the link between abuse and organic brain damage or suggest that Dr. Levit investigate the possibility of organic brain damage in Lesko. Attorney Marsh also failed to provide Dr. Levit with numerous documents, including records from Children and Youth Services, which, according to Dr. Levit's own testimony at the PCRA hearing, would have resulted in new or additional diagnoses of Lesko, including probable brain damage and substantial impairment in the capacity to appreciate the criminality of his conduct. *See* N.T. PCRA Hearing, 12/15/99, at 239–42.

While it is true that counsel cannot be expected to be a mental health expert, and although Attorney Marsh may have been officially "unschooled in mental health matters," Majority Opinion at 190–91, 15 A.3d at 382, the evidence shows in the instant case that Attorney Marsh was aware of the severe abuse and neglect Lesko suffered during his childhood. Attorney Marsh also had knowledge of the link between child abuse and brain damage, and, by his own testimony, understood the importance of presenting evidence of Lesko's brain damage to the jury in an effort to avoid a death penalty

verdict. Indeed, Attorney Marsh had been given related literature, and even a sample motion to obtain neurological testing of Lesko, yet he failed to act. Under such circumstances, I can conceive of no reasonable basis for counsel's failure to further investigate the matter, including obtaining the appropriate expert and providing that expert with the information known to him. Accordingly, I believe the PCRA court properly concluded that Attorney Marsh had no reasonable basis for failing to retain a neuropsychologist to evaluate Lesko and present testimony regarding organic brain damage.

Next, the Majority indicates that, even if it agreed with the PCRA court that Attorney Marsh's investigation "was unreasonable and constitutionally deficient, and that there was some basis in law to say that lawyers are obliged to consult neuropsychologists, rather than clinical psychologists," *id.* at 383, it does not agree with the PCRA court's determination that Lesko established he suffered actual prejudice, as required under *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). I likewise disagree with the Majority's conclusion with respect to this issue.

The Majority opines:

Lesko has not established that the resentencing proceeding was rendered unreliable by counsel's alleged lapse. This was a jury that found four mitigating factors, relating to two distinct statutory mitigating circumstances. Thus, the jury was engaged in a balancing of aggravators and mitigators, yet voted for death (just as Lesko's first sentencing jury had). To find *Strickland* prejudice arising from the failure alleged herein, we must conclude that "there is a reasonable probability that, absent counsel's failure to present the mitigation evidence he currently proffers, [Lesko] would have been able to prove at least one [more] mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s)."

Majority Opinion at 192–93, 15 A.3d at 383 (citation omitted).

The Majority further reasons:

[B]ased on counsel's presentation, the jury had found that Lesko was under the influence of extreme mental or emotional disturbance, § 9711(e)(2), and it is entirely speculative how much more weight the testimony of a neuropsychologist such as Dr. Crown would have lent to this mitigator already found. Of course, it is possible that opinion testimony on brain damage from a neuropsychologist might persuade a juror that Lesko was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law under Section 9711(e)(3). But, Lesko must also show that there is a reasonable probability that, in the overall evaluation, at least one jury member would have concluded that the mitigating circumstances outweighed the aggravating circumstances.

Faced with the aggravating circumstances where the defendant has been found guilty of multiple murders occurring within a one-week period, including the cold-blooded murder of an on-duty police officer, and the case in mitigation already successfully presented, we simply cannot conclude that *Strickland* relief can be premised upon the additional mitigation evidence the PCRA court found would have carried the day. The PCRA court failed to consider the full context of the case in rendering its finding as to *Strickland* prejudice. We do not believe there is a reasonable probability that further expert opinion evidence, including evidence of Lesko's "organic brain damage" would have resulted in a different weighing and different penalty verdict when the aggravating circumstances were so patently grave, and the jury already found substantial mitigating factors, only to return with a verdict of death.

*Id.* at 195, 15 A.3d at 384–85 (footnote omitted).

In support of its holding, the Majority cites the recent decision of the United States Supreme Court in *Smith v. Spisak*, —— U.S. ——, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010), wherein the Court held that, even presuming the closing argument of the defendant's counsel at trial was constitutionally inadequate, there was no reasonable probability that a

better closing argument would have made a significant difference in the outcome. The Majority explains that the *Spisak* Court, in reaching its conclusion:

> considered the context of the case, which included Spisak's admission and supporting testimony that he committed three murders and attempted to commit two others. The Court stressed that at the time of the sentencing the jurors had fresh in their minds the government's evidence regarding the killings as well as Spisak's "boastful and unrepentant confessions and his threats to commit further acts of violence." The Court also noted that the defense experts' testimony, which was offered to show that Spisak suffered from a mental infirmity, was fresh in the jurors' minds; and, the Court did not "see how it could have made a significant difference had counsel gone beyond his actual argument—which emphasized mental illness as a mitigating factor and referred the jury to the experts' testimony—by repeating the facts or connections that the experts had just described." *Id.* at 687–88. Notably, even the concurrence by Justice Stevens, which stressed "how thoroughly egregious counsel's closing argument was," ultimately concluded that Spisak was not entitled to relief in light of Spisak's testimony and his "monstrous" crimes. *Id.* at 693.
>
> The case *sub judice* obviously is not on all fours with the situation in *Spisak.* Most importantly, in this case we consider a claim of an allegedly incomplete mitigation presentation, and not a deficient jury argument. But the opinion is instructive as to how this Court should address the question of prejudice under *Strickland.* The *Spisak* Court made clear that the prejudice analysis must be viewed in the context of the case; and in this case, the developed penalty-related facts were grim indeed.

Majority Opinion at 193–94, 15 A.3d at 384.

To say that the instant case "obviously is not on all fours" with *Spisak* is, to my mind, an understatement. In *Spisak,* the evidence suggesting Spisak suffered from a mental infirmity, which the Court determined had been summarized in a deficient closing argument, had been fully developed and presented to the jury. In the instant case, testimony that

Lesko suffered from organic brain damage was never presented to the jury, and, thus, the jury did not have the opportunity to consider whether Lesko lacked the ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. In short, *Spisak* concerned a poor closing argument, whereas the instant case involves a failure to present relevant evidence.

With regard to the Majority's ultimate conclusion that, in light of the gravity of the crimes, there is no reasonable probability that additional expert testimony, including evidence of Lesko's organic brain damage, "would have resulted in a different weighing and different penalty verdict," Majority Opinion at 195, 15 A.3d at 385, as this Court explained in *Commonwealth v. Sattazahn,*

in terms of prejudice, we recognize that the substantial aggravation advanced by the Commonwealth encompassed Appellee's commission of the present killing in the perpetration of a robbery, as well as his history of violent offenses including two murders. Nevertheless, the presentation at trial of the credited post-conviction evidence would have provided support for the finding of several statutory mitigators, which also bore upon the degree of Appellee's culpability in terms of selecting between capital punishment and a life sentence. *See Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) (explaining that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse" (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring))). The absence, due to an inadequate investigation, of substantial, relevant, mitigating evidence diminishes confidence in the outcome of the sentencing proceeding, particularly given the appropriate single-juror frame of reference. *See Wiggins [v. Smith,* 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ] (articulating the prevailing standard for assessing prejudice from

deficient stewardship in the presentation of mitigation evidence in terms of whether "there is a reasonable probability that at least one juror would have struck a different balance").

597 Pa. 648, 676–77, 952 A.2d 640, 656–57 (2008) (footnote omitted).

In the instant case, the jury found four mitigating factors, relating to two separate mitigating circumstances, namely, that Lesko was under the influence of extreme mental or emotional disturbance, § 9711(e)(2); and the catch-all provision of Section 9711(e)(8). Testimony that Lesko suffered from organic brain damage would have implicated an additional mitigating circumstance—the inability of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law under Section 9711(e)(3)—that had not already been found by the jury. Furthermore, as the PCRA court recognized, because the jury is instructed to engage in a qualitative rather than a quantitative weighing of mitigating and aggravating circumstances, there is a reasonable probability that uncontroverted testimony such as Dr. Crown's regarding Lesko's organic brain damage would have resulted in the jury giving greater weight to the Section 9711(e)(2) mitigator in favor of a life sentence. PCRA Court Opinion, 8/7/06, at 22. Accordingly, I cannot agree with the Majority's conclusion that, even if the jury had been presented with evidence of an additional mitigating circumstance under Section 9711(e)(3), Lesko failed to show there was a reasonable probability that at least one jury member would have concluded that the mitigating circumstances outweighed the aggravating circumstances.

For the reasons discussed above, I find no error in the PCRA court's conclusion that trial counsel had no reasonable basis for failing to retain a neuropsychologist for the purpose of evaluating Lesko and presenting testimony on organic brain damage. Furthermore, I agree with the PCRA court's determination that, but for counsel's ineffectiveness in this regard, there is a reasonable probability that the result of the penalty proceeding would have been different. Accordingly, I believe the PCRA court properly held that Lesko is entitled to a new

penalty hearing, and I would affirm the PCRA court's grant of a new penalty hearing on the basis that Lesko was denied his right to effective assistance of counsel. Hence, I dissent from the Majority Opinion to the extent it reverses the PCRA court's order granting Lesko a new penalty hearing.